George Gordon REYNOLDS, Plaintiff,

v.

TEXAS GULF SULPHUR COMPANY, a Texas corporation, and Charles F. Fogarty, Defendants.

Walter A. MITCHELL, Plaintiff,

v.

TEXAS GULF SULPHUR COMPANY, a Texas corporation, and Charles F. Fogarty, Defendants.

Lawrence A. KARLSON, and Alice A. Karlson, Plaintiffs,

v.

TEXAS GULF SULPHUR COMPANY, a Texas corporation, and Charles F. Fogarty, Defendants.

Arthur R. STOUT, Jr., and Mary Louise Stout, Wife, Plaintiffs,

v.

TEXAS GULF SULPHUR COMPANY, a Texas corporation, and Charles F. Fogarty, Defendants.

Nos. C 132-66, 62-67, 59-67 and 54-67.

United States District Court
D. Utah, C. D.
Jan. 9, 1970.

See also, D.C., 309 F.Supp. 566.

Parker M. Nielson and A. Reed Reynolds, Salt Lake City, Utah, for plaintiffs, George Gordon Reynolds, Lawrence L. Karlson and Alice A. Karlson.

Verl C. Ritchie, Oscar W. Moyle, Jr., Hardin A. Whitney, Jr., and O. Wood Moyle, III, Salt Lake City, Utah, for plaintiffs, Arthur R. Stout, Jr. and Mary Louise Stout.

Roy G. Haslam, Salt Lake City, Utah, for plaintiff, Walter A. Mitchell.

Calvin A. Behle, Keith E. Taylor, Salt Lake City, Utah, White & Case, Orison S. Marden and P. B. Konrad Knake, Jr., New York City, for defendants Texas Gulf Sulphur Co. and Charles F. Fogarty.

RITTER, Chief Judge.

Common to all four cases, which were consolidated for trial, are alleged violations of Sec. 10(b) of the Securities and Exchange Act of 1934 [1] and Rule 10b–5 promulgated by the Securities and Exchange Commission.[2] One complaint includes a count in common law fraud, another alleges a conspiracy between the defendants to violate Sec. 10(b) and Rule 10b–5. Another complaint alleges violations by defendants of affirmative fiduciary duties to disclose inside information, and alleges violations of Sec. 9 of the Securities and Exchange Act of 1934.[3] The cases have been tried upon the theory of violations of Section 10(b) and Rule 10b–5. The other claims have not been pressed. Recovery of damages under the theory of violations of Section 10(b) and Rule 10b–5 precludes recovery of further damages in any event.

After the actions were filed, defendants filed an original action with the United States Court of Appeals for the Tenth Circuit under its Rule 28, seeking a writ of prohibition to restrain the trial judge from proceeding to try the actions, and a writ of mandamus directing the trial judge to (a) set aside his order denying petitioners' motion to transfer the cases to the United States District Court for the Southern District of New York under 28 U.S.C. Sec. 1404 (a), (b) transfer the cases as to defendant Texas Gulf Sulphur Co., and (c) either dismiss the action as to defendant Charles F. Fogarty or, in the alternative, transfer the case as to such defendant to the New York Federal Court.[4] The Court of Appeals, without making any final determination of facts necessary to

1. 15 U.S.C. Sec. 78j(b).

2. 17 C.F.R. 240.10b–5.

3. 15 U.S.C. Sec. 78i.

4. Texas Gulf Sulphur, et al. v. The Honorable Willis W. Ritter, et al., 371 F. 2d 145 (1967).

prove venue, refused to issue either a writ of prohibition or a writ of mandamus, and upheld the action of the trial judge in overruling the motion attacking venue. The court stated that as to the corporate defendant venue and process are good "because, without dispute, it transacts business in Utah." As to both the individual defendant, Fogarty, and the company, the court held venue will lie in the Utah district "if any of the acts or transactions complained of took place in that district" and, further, that if "venue lies in Utah for that reason, valid process may be had upon Fogarty personally 'in any other district of which the defendant is an inhabitant or wherever the defendant may be found.'" Fogarty's preparation and issuance of a press release to representatives of financial firms and newspapers for transmission over instrumentalities of interstate commerce to branch offices and newspapers throughout the country, which press release plaintiffs contend violated Sec. 10(b) and Rule 10b–5, is sufficient to satisfy requirements of venue and service of process as to defendant Fogarty in three of the four actions. Defendants contend that as to the fourth action there is no venue or proper service of process on Fogarty because the plaintiff in that action sold his stock in December, 1963, several months before issuance of the press release, and because none of the acts or transactions complained of took place in the Utah District.

## Jurisdiction

Jurisdiction as to all parties exists (a) under 28 U.S.C. Sec. 1331, the amount in controversy in each of the consolidated cases being in excess of $10,000.00, exclusive of interest and costs, and there being necessary diversity of citizenship between the parties in each case, and (b) by virtue of the allegations in each case of violations of provisions of Sec. 10(b) of the federal statute and S.E.C. Rule 10b–5.

## Factual Background

In November, 1963, Texas Gulf Sulphur Co. (herein sometimes "TGS") core drilled an anomaly [5] near Timmins, Ontario, Canada, which had been detected during the course of an aerial and ground geophysical survey program. The drilling of this hole [6] was completed November 12, 1963, at a depth of 655 feet. Visual examination of the core by the company's chief geologist, Walter Holyk, indicated an average copper content of 1.15%, and an average zinc content of 8.64% over a length of 599 feet. The core was split longitudinally and one-half was sent to a Utah assay house for chemical analysis. The chemical assay proved that the visual appraisal was uncommonly accurate. It disclosed an average mineral content of 1.18% copper, 8.2% zinc, and 3.94 ounces of silver per ton over a length of 602 feet.

The visual appraisal of the core prompted the company to take steps to improve its position without waiting for the chemical assay. The anomaly tested by this hole included lands to which the company did not at the time have the mineral rights, and TGS concluded that additional tracts of adjoining lands should be acquired. Immediate action was taken to maintain secrecy as to the results of the first hole. The president of the company issued an order that no one outside of the exploration group [7] should be told of the prospect, the drill camp was moved to another site, all signs of drilling activity were removed and the drill site was camouflaged by standing cut saplings in the snow. A second hole was intentionally drilled off of the anomaly to divert attention from Kidd–55–1, and the barren core was left lying on the ground near K–55–2.

5. An area where there are variations in electrical conductivity, from normal background, of underlying rock formations.

6. The initial hole was on what was known as the Kidd–55 segment of land. It was designated K–55–1. Subsequent holes were designated K–55–2, K–55–3, etc.

7. The information was even withheld from other officers, directors and employees of TGS.

The importance of the findings based on the core from the first test hole was indicated by a Memorandum for the Files, prepared November 14, 1963, by the company's chief geologist, in which the statement was made that this drill hole "intersected significant copper and zinc mineralization throughout the entire cored length of 655 feet." The author of the memorandum noted that the intersection was "obviously of ore grade" but he warned against "extrapolating this intersection to tonnage estimates" and pointed out that it would be impossible to estimate the true width of the sulphide zone until a second drill hole was directed across the intersection from west to east. The first hole had been drilled from east to west. He concluded the memorandum with the observation that efforts should be made to acquire adjoining lands through purchase or option agreements.

TGS acquired three additional 160-acre tracts adjacent to the site of the initial drill hole—one in December, 1963, another in February, 1964, and the third on March 27, 1964.[8] Drilling was resumed on March 31, 1964, when drill hole K-55-3 (in reality the *second test hole* because K-55-2 was intentionally drilled off of the anomaly) was commenced. It was started 510 feet west of K-55-1 and was drilled in an easterly direction at a 45 degree angle so as to cross K-55-1 in a vertical plane. It was completed by 7:00 p. m. April 7, 1964.[9] Visual appraisal of the core of K-55-3 compared very favorably with both the visual appraisal and the chemical assay of the core of the first drill hole. The visual examination of the third core indicated an average mineral content of 1.12%

copper and 7.93% zinc over 641½ feet of its 876-foot length. This core eliminated the chance that K-55-1 had been drilled "down-dip" and established generally the east and west margins of the sulphide ore body.

Test hole K-55-4 was started 200 feet *south* of K-55-1 and was drilled from east to west at a 45 degree angle in a vertical plane parallel to the vertical plane of the first hole. It was completed by 7:00 p. m., April 10. Again, visual examination of the core indicated significant mineralization—mineral content of 1.14% copper and 8.24% zinc for 366 feet of its 579-foot length. The significance of the date and time—April 10, 7:00 p. m.—lies, first, in the admission by defendants that although its press release of Sunday, April 12, purported to reflect the results of drilling "done to date" it actually was based upon drilling information as of the evening of April 10, and, second, in the contention of plaintiffs that even upon the basis of information available on the evening of April 10, the press release was inaccurate and misleading.

By 7:00 p. m. on April 10 some drilling had been done in holes K-55-5 and K-55-6. K-55-5 was started on April 10 at a point 200 feet *north* of K-55-1, and was slanted westerly at an angle of 45 degrees in a vertical plane parallel to an assumed plane containing K-55-1 and K-55-3. At 7:00 p. m. that evening substantial copper mineralization had been encountered over the last 42 feet of this hole's length at that time, which was 97 feet. K-55-6 was started on April 8, two days before the start of K-55-5, at a point 300 feet *easterly* of K-55-1. It was drilled in a westerly direction at an angle

8. Defendant's Exhibit P–2 includes photostat copy of a story that appeared in the April 17, 1964 issue of the Wall Street Journal relative to the press conference held April 16, 1964, at which TGS announced its "major strike". The story quotes Claude O. Stephens, president of TGS, as stating that Texas Gulf's "land position is favorable" and further that "Texas Gulf holds the mineral rights in 70% of Kidd township and

has substantial acreage in adjacent townships." The Wall Street Journal story also reported that another TGS official had estimated that TGS had options, claims or ownership of about 60,000 acres in the area.

9. Because of the importance of events occurring between March 31 and April 16, 1964, particular dates and times are of special significance.

of 60 degrees, and was intended to explore mineralization *beneath* K–55–1. By the evening of April 10, substantial copper mineralization had been encountered over the last 127 feet of the hole's length, which at that time was 569 feet.

Between the evening of April 10 and the morning of April 13, when the press release information was published substantial copper mineralization had been encountered in K–55–5 to the 580-foot mark, an additional 483 feet of mineralization since the evening of April 10, and visual estimates of the core indicated an average mineral content of 0.82% copper and 4.2% zinc over a 525-foot length. At that time K–55–6 had been drilled to the 946 mark and had encountered mineralization. Two more holes, K–55–7 and K–55–8, were commenced on April 12 and 11, respectively. K–55–8 was a broader hole drilled for the purpose of obtaining a core that could be used in metallurgical tests of the amenability to milling of the materials encountered.

*Rumors in Canada and New York*

Although the company had treated the first test hole as "tight", rumors began to spread shortly after the first of the year 1964, and there was considerable excitement in Timmins and Toronto about a reported discovery. By early April, 1964, there was a "tremendous staking rush going on", according to the testimony of Richard D. Mollison, TGS vice president in charge of exploration, and lands within several miles of the area had been staked. People were watching all surface traffic, and low-flying planes passed over the area several times a day. Silence and secrecy on the part of TGS and its officials were not effective to curb widespread rumors and speculation in Canada and later in New York.

On April 9, 1964, the Toronto Globe and Mail published a story in which it was stated that "Rumors that one of the biggest copper deposits in North America has been discovered near Timmins have Bar Street agog", and that in the past two weeks the Toronto Stock Exchange "has been experiencing its wildest speculative spree since the Nineteen Fifties." The Toronto Daily Star on the same day stated that rumors had gained ground "of a major copper strike about 10 miles North of Timmins by Texas Gulf Sulphur Co." On April 10 the Toronto Globe and Mail reported that speculative mining fever still gripped the Toronto stock market "as officials of Texas Gulf Sulphur Co. of New York maintained a tight-lipped silence on what —if anything—they have discovered in Northern Ontario."

The rumors spread to the United States and on the morning of Saturday, April 11, 1964, both the New York Times and the New York Herald Tribune carried stories about the rumored discovery. The Times story referred to an unverified rumor that TGS "had made a sensational copper strike" that had caused "feverish activity in penny speculatives on the Toronto market", and to a reported surge of staking in various townships flanking Timmins, and to hotels and motels bulging with prospectors and would-be prospectors. The story in the Herald Tribune in part reported:

> The biggest ore strike since gold was discovered more than 60 years ago in Canada has stampeded speculators to the snowbound old mining city of Timmins, Ontario, some 450 miles northwest of Toronto.
>
> This time it's copper \* \* \*
>
> The story of the strike goes something like this: Texas Gulf Sulphur has been active in the Big Water area, accessible only by airplane, for several years. The richness of the copper it discovered was so great that samples reportedly were flown out of the country to be assayed.
>
> The huge lode is supposed to consist of a bed of copper sulfite (sic) 600 feet wide with a possible over-all copper return of 2.87 per cent through most of its width. This yield, in itself, is considered rich in mining circles.

But the richest yield comes from the first 100 feet of that 600-foot belt. It is supposed to be 5.6 per cent, a bonanza if the story proves more than just a myth. But myth it may be * * *

The story of the strike reportedly leaked out when it was discovered that certain employees of Texas Gulf Sulphur were buying into the company's stock * * *

*Press Release of April 12*

With the appearance of the Times and Herald Tribune stories TGS decided to issue a press release. The president of the company, Claude O. Stephens, directed the executive vice president, Charles F. Fogarty, to prepare the release. After consulting with public relations advisers, legal counsel, the vice president in charge of exploration, and others, the following statement (quoted in pertinent part) was given to newsmen and representatives of financial publications in the late afternoon or early evening of April 12:

"New York, April 12—The following statement was made today by Dr. Charles F. Fogarty, Executive Vice President of Texas Gulf Sulphur Company, in regard to the company's drilling operations near Timmins, Ontario, Canada. Dr. Fogarty said:

" 'During the past few days, the exploration activities of Texas Gulf Sulphur in the area of Timmins, Ontario, have been widely reported in the press, coupled with rumors of a substantial copper discovery there. These reports exaggerate the scale of the operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.

" 'The facts are as follows. TGS has been exploring in the Timmins area for six years as part of its overall search in Canada and elsewhere for various minerals—lead, copper, zinc, etc. During the course of this work, in Timmins as well as in Eastern

Canada, TGS has conducted exploration entirely on its own, without the participation of others.

" 'Numerous prospects have been investigated by geophysical means and a large number of selected ones have been core-drilled. These cores are sent to the United States for assay and detailed examination as a matter of routine and on advice of expert Canadian legal counsel. No inference as to grade can be drawn from this procedure.

" 'Most of the areas drilled in Eastern Canada have revealed either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies.

" 'Recent drilling on one property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.

" 'The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reaonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project * * *' "

Plaintiffs contend that the foregoing press release is inaccurate, incomplete, misleading and deceptive. Defendants take the position that it was accurate at the time it was prepared and issued. Before discussing the contentions of the parties with respect to the press release we call attention to few more facts.

*Public Announcements of Major Strike on April 16*

On the day that the information contained in the foregoing press release was

published—Monday, April 13—a reporter for The Northern Miner, a Canadian mining industry journal, by invitation visited the properties near Timmins, inspected the drill cores and conferred with TGS officials, including its chief geologist and its vice president in charge of exploration. Around the first of April, approximately 12 days prior to the press release, Mr. G. M. Ackerley, a reporter with The Northern Miner, had been orally invited by a vice president of TGS to visit the properties on April 20, 1964, for the purpose of preparing an article. This oral invitation was confirmed by a letter dated April 6 from vice president Richard D. Mollison, who testified that he gave Ackerley the invitation in response to repeated requests from him "and because of all the wild rumors and wild statements that were already so prominent in that district, and with my expectation that three weeks' time, three weeks of drilling, would throw some light on what there was and he could come up then at the end of that three weeks and see what it was." A meeting of the stockholders of TGS had been scheduled for April 23. Mr. Mollison further testified that because of the development of the rumors in Canada and New York they decided to invite Mr. Ackerley to come a week earlier.

On the basis of what he saw and heard on April 13, Mr. Ackerley prepared an article which, in accordance with previous understanding, he submitted to Mr. Mollison for him to hold until the company was ready to release the same. Mr. Mollison made an insignificant change by adding some names of exploration department personnel and on April 15 returned the article to Mr. Ackerley for publication. It was published on the morning of April 16, the same day that TGS notified the press in New York that it had made a major strike. In pertinent part Mr. Ackerley's article read:

"Texas Gulf Sulphur has chalked up a brilliant exploration success * * a major new zinc-copper-silver mine is definitely in the making * * *

" * * * on the basis of seven tests either completed or drilling it can be stated that a strike length of 600 ft. minimum has been established showing an ore width of roughly 300 ft. which has been traced so far to a maximum vertical depth of about 800 ft. * * * this must be recorded as one of the most impressive drill holes completed in modern times.

"For a core length of a shade better than 600 ft., the hole averaged in excess of 1% copper, 8% zinc and nearly four ounces of silver.

"And there are impressive, strong sections within this width which in themselves are quite spectacular. In the upper part of the hole, for example, a core length of 82 ft. ran 7.1% copper, 9.7% zinc, and 2.4 ozs. silver. And still deeper, a strong zinc section of better than 100 ft. averaged out to in excess of seven ounces of silver in addition to ore-grade zinc values * *

"From the dimensions already known, the Northern Miner can say that something in excess of 10,000,000 tons of ore is indicated. It is capped with something like 20 ft. of overburden, presenting no stripping problems, and the steep dip and wide widths will lend themselves ideally to an open-pit mining situation.

"The picture should unfold rapidly at this stage, but officials emphasize that it is still at the embryo point. * * * "

On April 16, TGS announced to the press a strike of at least 25,000,000 tons of ore. A prepared release was read to representatives of the press and of financial publications at 10:00 a. m., and summaries of the announcement appeared on the private wire services of Merrill, Lynch, Pierce, Fenner and Smith and of Dow Jones within the hour. In part this release read:

"Texas Gulf Sulphur Company has made a major strike of zinc, copper and silver in the Timmins area of Ontario, Canada. * * *

"Seven drill holes are now essentially complete and indicate an ore body of at least 800 feet in length, 300 feet in width and having a vertical depth of more than 800 feet * * *

"This is a major discovery. The preliminary data indcate a reserve of more than 25 million tons of ore. The only hole assayed so far represents over 600 feet of ore, indicating a true ore thickness of nearly 400 feet * *

"Visual examination of cores from the other holes indicates comparable grade and continuity of ore.

"The ore body is shallow, having only 20 feet of over-burden. This means that it can easily be mined initially by the open pit method * * *"

*Stock Purchases and Stock Option Acquired by Fogarty.*

The record establishes that prior to completion of the first test hole on November 12, 1963, Fogarty had purchased a total of 705 shares of TGS stock. On that date he purchased 300 shares, on November 15, 700 shares, on November 19, 500 shares and on November 26, an additional 200 shares. On December 30 and 31, 1963, which was about two weeks after the company received the chemical assay reports on the core taken from the first hole, Fogarty purchased 300 shares. Drilling was resumed on March 31, 1964, and the following day Fogarty bought 400 shares of TGS stock, and an additional 300 shares on April 6, making a total of 3100 shares of TGS stock purchased between November 12, 1963, and April 6, 1964.

On February 20, 1964, Fogarty received a stock option for 7300 shares of TGS stock. Other TGS officials also accepted stock options on that date. The evidence establishes that members of the stock option committee were not aware of the results of drilling near Timmins at the time the stock options were awarded. Fogarty subsequently surrendered his stock option unexercised, and "returned" to the company at his cost all stock purchased by him during the period November 12, 1963 to April 6, 1964. The record discloses that other TGS officials, including Richard D. Mollison, vice president in charge of exploration, and the company's chief geologist, Walter Holyk, either personally or through agents purchased TGS stock during the same period, as did several other employees of the company.[10] All purchases of TGS stock by Fogarty were made through the New York stock exchange.

*Purchases and Sales of TGS Stock by Plaintiffs.*

Plaintiffs purchased and sold stock in Texas Gulf Sulphur Company as follows:

*George Gordon Reynolds:* purchased 300 shares January 7, 1960, at $18⅝ per share, and 200 shares, on May 18, 1962, at $15 per share. He sold 500 shares on April 16, 1964, at $33⅝ per share.

*Arthur R. Stout and wife:* purchased 1,000 shares February 5, 1962 for $20½ per share. They sold 1,000 shares April 21, 1964, at $42 per share.

*Lawrence L. Karlson and wife:* purchased 100 shares on October 10, 1963, for $16⅝ per share, and sold the same on December 11, 1963, for $20⅞ per share.

*Walter A. Mitchell:* purchased 420 shares between December 11, 1953, and May 17, 1962, at prices ranging from $15 to $80¼ per share. He sold 400 shares on April 17, 1964, for $40 per share, and 20 shares on April 23, 1964, for $46¼ per share.

## VIOLATIONS OF SECTION 10(b) AND RULE 10b–5

Common to the complaints in all four cases are alleged violations of Section

---

10. Some of the purchases were of "calls" for TGS stock. A "call" is a negotiable option contract by which the bearer has the right to buy from the writer of the contract a certain number of shares of a particular stock at a fixed price on or before a certain agreed-upon date.

10(b) of the Securities and Exchange Act of 1934,[11] and Securities and Exchange Commission Rule 10b–5.[12] The statutory provision in part provides:

"Sec. 78j. *Manipulative and deceptive devices.*

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The S.E.C. Rule, which is patterned in form and language after Section 17(a) of the Securities Act of 1933,[13] provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person".

Neither the statute nor the Rule expressly provides for private civil remedies for fraud or misrepresentation in connection with a purchase or sale of any security, manipulative or deceptive practices, or for failing to disclose material information not otherwise available to the other party to a transaction. Judicial decisions, however, have firmly established such civil remedies as being implicit in the provisions. A leading case, Kardon v. National Gypsum Co.[14] has been cited and followed in a number of later cases. In Hooper v. Mountain States Securities Corp. the court said:

"We need not repeat here the history now so well catalogued which traces the exercise by the SEC of the legislative power granted in § 10(b) to promulgate regulation X–10B–5. A significant purpose of X–10B–5 was to extend to *sellers* the same protection against fraudulent and other unlawful schemes afforded to those defrauded in the purchase of securities. In a substantive way it is even more sweeping. It greatly expands the protection frequently so hemmed in by the traditional concepts of common law misrepresentation and deceit, the requirement of privity, proof of specific damage, inadequacy of the right of rescission or right to recover up to par value of stock of a much greater market value. To these difficulties would have to be added the geographic obstacle of suit in a common forum against multi-state defendants scattered as far as the fraudulent device required. \* \* \*"

---

11. 15 U.S.C. Section 78j(b).

12. 17 C.F.R. 240.10b–5.

13. 15 U.S.C. § 77q.

14. 73 F.Supp. 798 (E.D.Pa.1947). See also Fischman v. Ratheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); Speed v. Transamerica Corp., 99 F.Supp. 808; Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. den. 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Slavin v. Germantown Fire Ins. Co., 174 F.2d 799 (3rd Cir. 1949); Fratt v. Robinson, 203 F.2d 627, 37 A.L.R. 2d 636 (9th Cir. 1962); Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Kohler v. Kohler, 208 F.Supp. 808 (E.D. Wis.1962), aff'd 319 F.2d 634, 7 A.L.R. 3d 486 (7th Cir. 1963).

In the case of Speed v. Transamerica Corp., supra, the court held that an implied misrepresentation can be just as fraudulent as an express one, that the three sub-paragraphs of Rule 10b–5 are mutually supporting and not mutually exclusive, and that a defendant's breach of duty to disclose accordingly can be viewed as a violation of all three sub-paragraphs, i. e., (1) a device, scheme, or artifice to defraud, (2) an implied misrepresentation or misleading omission, and (3) an act, practice or course of business which operates or would operate as a fraud.

Plaintiffs here contend that they have been damaged by violations of the statute and the rule by both the corporation and Fogarty, its executive vice president, (1) for failure to disclose prior to April 16, 1964, information as to the results of drilling at the property, and (2) in issuing an inaccurate, misleading and deceptive press release, which was published April 13, 1964. The decision to maintain secrecy and to not disclose the results of the drilling was made or concurred in by the president of the company, Claude O. Stephens, the executive vice president, Charles F. Fogarty, the vice president in charge of exploration, Richard D. Mollison, the company's chief geologist, Walter Holyk, and some other company officials and employees. Obviously, this was a decision of the corporation itself, even though some officers and directors were not informed of the drilling results until a public announcement was made on April 16, 1964.

*Karlson Case.*

■ Plaintiff Karlson sold his stock on December 11, 1963, through a stock exchange. There was no face-to-face transaction. Fogarty did not purchase the particular shares sold by Karlson.

While it is not necessary for Karlson to establish privity of contract in order to recover for violations of the statute or rule,[15] and the fact that there was a total non-disclosure would not prevent recovery if some form of manipulation was involved,[16] it nevertheless is necessary for Karlson to prove some causative effect.

■ In the case brought against Texas Gulf Sulphur Company, Fogarty and other TGS officials and employees, by the Securities and Exchange Commission,[17] the Circuit Court found that Fogarty had violated Section 10(b) and Rule 10b–5 by purchasing TGS stock without publicly disclosing the insider information he possessed. It does not follow that such purchases by Fogarty, some of which were made prior to the time Karlson sold his stock, caused any damage to Karlson, and the record before us does not support any such contention. Corporations and their executives undoubtedly owe duties to stockholders to keep them reasonably informed as to corporate affairs and such matters as the mineral discovery here involved, but that duty does not surpass all other duties owed to stockholders. Here, for instance, the company and Fogarty were also under a duty to TGS stockholders, including Plaintiff Karlson, to not make information concerning the mineral discovery public until the company could first protect itself by acquiring mineral interests in adjoining lands. Plaintiff Karlson sold his TGS stock barely a month after completion of the first test hole and before the company had received all of the reports of the chemical analysis of the core extracted from that hole. The record discloses that such reports were received during the period December 9 to 13. He also sold prior to the time the company had been able to acquire the adjoining lands upon which

15. Cochran v. Channing Corp., 211 F. Supp. 239 (S.D.N.Y.1962); Fischman v. Ratheon Mfg. Co., 188 F.2d 783. (2d Cir. 1951).

16. List v. Fashion Park, Inc., 340 F. 2d 457, 22 A.L.R.3d 782 (2d Cir. 1965),

cert. den. 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

17. Securities and Exchange Commission v. Texas Gulf Sulphur, et al., 401 F.2d 833, 842 (2d Cir. 1968).

the anomaly was found. The court believes it is not necessary to pass upon the materiality [18] of the information available to defendants on December 11, 1963, because of his findings that there was no duty at that time on the part of either defendant to disclose the information then available with respect to drilling results, and that Fogarty's violations of the statute and the rule by purchasing TGS stock did not cause any damage to Plaintiff Karlson. The press release which the court has found to be misleading and inaccurate was not issued until four months after Karlson sold his stock.

*Reynolds Case.*

Plaintiff Reynolds made two purchases of TGS stock, 300 shares on January 7, 1960, at $18⅝ a share and 200 shares on May 18, 1962, at $15 per share. He sold his 500 shares early on the morning of April 16, 1964, after hearing about a "rumor" and a "flurry" in the stock, but before he learned that there had been an announcement of a "major strike" or "discovery". He testified that he sold on the strength of the April 12, 1964 press release, a summary of which came over the wires on the morning of April 13th.

An account executive with the Salt Lake City office of a national brokerage firm testified that after he read the summary of the April 12 release he telephoned Reynolds because he knew Reynolds was vitally concerned about TGS stock; that during their conversation he told Reynolds that the report "didn't make any positive statements about what had happened" and "that the report * * * didn't seem to substantiate the price action of. the stock to that point." Reynolds testified that on the 13th he decided to hold the stock to see what hap-

pened, that he believed the press release, but that it made him feel that "someone was throwing a wet blanket" and that they were trying to say "we haven't got it."

Reynolds further testified that on April 16 the same account executive called him and "said there was a rumor that Texas Gulf Sulphur had made a strike"; that he (Reynolds) "hardly believed it" but "thought it was a promotion propaganda of some kind" and decided to "get out while the getting was good." He sold his stock through the broker for $33⅝ per share. He also testified that if it hadn't been for the release which came over the wires on the 13th he would have kept his TGS stock; that if he had known of the November, 1963, test core hole he would have doubled his holdings. He did not learn of the contents of the April 16 release until later in the afternoon of that day (April 16) when the stock closed around $37, and that he did not buy back because "very few investors will ever chase a stock" and because he had already sold and was in a position where he would have to pay taxes on his profits.

From the record the court concludes that the press release dated April 12, 1964, was inaccurate, misleading and deceptive with respect to material matters disclosed by the company's drilling near Timmins. The authors of the release knew from visual and chemical analyses that the first core disclosed the presence of copper and zinc mineralization of ore-grade [19]; that the second test hole (K–55–3) virtually eliminated any chance that the initial test hole had been drilled "down-dip"; that cores from drill holes located 200 feet south and 200 feet north of the initial test hole contained similar

---

18. See sub-paragraph (2) of Rule 10b–5, supra.

19. In the Memorandum for the Files, previously referred to, prepared on November 14, 1963, by Chief Geologist Holyk, he wrote that the intersection encountered in the first drill hole was "obviously of ore grade." An article in the April 24, 1964 issue of the Wall Street Journal

(part of defendant's Exhibit P–2) states that at the annual meeting of TGS stockholders held April 23, 1964 at Houston, the president of TGS in responding to questions from stockholders stated that "when we drilled the first hole, we knew we had something. But Canadian newspapers were carrying reports with no basis whatsoever."

mineralization; and that still another drill hole core had disclosed similar mineralization at greater depths than were reached by the other drill holes.

The release painted a bleak and gloomy picture—most of the areas drilled in Eastern Canada revealed either barren pyrite or graphite without value; a few resulted in discoveries of small or marginal sulphide ore bodies, etc. Not a word, however, about the results of any of the drilling near Timmins, except that it had led to "preliminary indications" that more drilling would be necessary for a proper evaluation. The drilling "to date had not been conclusive" and has not been "sufficient to reach definite conclusions" and "any" statement "as to size and grade of ore would be premature and possibly misleading." But a newspaper reporter's finding, made on the same day the press release was printed, that the drillings indicated more than 10,000,000 tons of ore, and the same reporter's statement that one hole averaged in excess of 1% copper and 8% zinc, went unchallenged when submitted to vice president Richard D. Mollison who released the article on April 15th for publication. Obviously, the reporter was quoting figures given to him by officials of the company, and given to him on April 13th. It may very well have been that the company officials when they prepared the release dated April 12, were trying to hold the big news until just before, or on the day of, the stockholders annual meeting which was held on April 23rd. In any event, the court finds the release dated April 12 was deceptive, misleading and inaccurate and violated both the statutory section 10(b) and the Rule provision 10b–5, and finds that plaintiff Reynolds was misled and deceived, to his detriment, and is entitled to recover damages.

With respect to Mr. Ackerley's statement that from his examination on the 13th of April there were in excess of 10,000,000 tons or ore indicated, it is interesting to note the testimony of one of plaintiffs' witnesses, Dr. Francis W. Christiansen, a geologist. Dr. Christiansen testified that from his examination of cores, assays, logs and other data pertaining to drilling up to 7:00 p. m. on April 10, he calculated the indicated tonnage of ore at 7,390,000 tons. He testified further that drilling up to 7:00 p. m. on April 11, added 2,600,000 tons of indicated ore, and that drilling up to the evening of April 12 added 1,800,000 tons more, making a total 11,790,000 tons of indicated ore as of Sunday evening, April 12th.

*Mitchell Case.*

Plaintiff Mitchell, a C.P.A., residing in Los Angeles, purchased 420 shares of TGS stock between December 11, 1953 and May 17, 1962, at prices from $15 to $80¼ per share. On April 16, 1964, the first free day he had had following the income tax season, he stopped by to see one of his brokers between 9:00 and 9:30 a. m., to inquire about TGS stock which he had noticed had been rising over several weeks. His broker gave him a copy of the "New York Morning News Digest", dated April 13, 1964, published by E. F. Hutton & Company, in which appeared the following:

"In the financial press this morning, management of Texas Gulf Sulphur states that reports that it has discovered a large lode of rich copper in Canada are premature and possibly misleading."

He also read the article in the western edition of the Wall Street Journal for April 13, 1964, the first paragraph of which read:

"New York—Texas Gulf Sulphur Co. called reports that it has discovered a large lode of rich copper ore in Canada 'premature and possibly misleading.'"

After reading the foregoing articles Mr. Mitchell returned to his office, reviewed his file on TGS and "came to the conclusion, based upon the report, the release of April 13 by Texas Gulf Sulphur, that the stock could not sustain its present rise and that it would fall back as soon as that release had been disseminated and

recognition given to it by the public." He then went to a second broker and instructed him to sell 400 shares. It was a "short sale against the box." This was about 11:30 or 11:45 a. m. Later in the afternoon he discovered he had overlooked 20 shares and when he took the certificates for the 400 shares in to his broker he told the clerk that he would bring in the 20 shares the following morning and that they were to be sold. They were delivered on the morning of the 17th with instructions to sell short against the box.

At the time Mitchell sold his stock he had no knoweldge of any press release other than that of April 12th. Under cross-examination he testified that "the reason I sold short was that I did not want to part with my Texas Gulf Sulphur stock * * * I reasoned that inasmuch as the market could not sustain itself in view of the report—the release of April 13—that I could sell short, buy back at a lower price, and in the meantime retain the stock I owned; namely, the 420 shares * * *" [20] On the 16th the bid price was in the neighborhood of $37 so he sold 400 shares at $40 a share. When he took the 20 shares in on the 17th the stock had gone up somewhat and he put those shares in at $45. Even though he gave his broker instructions to sell the 20 shares on the 17th, for some reason unknown to plaintiff Mitchell, the order to sell was not put through by the broker until April 22, and the stock was sold on the 23rd for $46¼ per share.

Plaintiff Mitchell testified that the article in the Wall Street Journal of April 13 "was the motivation that caused me to sell short."

The court agrees with Plaintiff Mitchell that the press release dated April 12, 1964, was false, misleading, deceptive and fraudulent; that it contained misstatements of material facts and omitted and concealed material facts with respect to the progress of drilling—all in violation of Section 10(b) of the Securities Exchange Act of 1934, and S.E.C. Rule 10b–5. It omitted all information as to the results of chemical and visual appraisals of cores, and gave no information as to the number of holes drilled or the type of mineralization encountered. It was a misstatement to say that recent drilling had led to "preliminary indications that more drilling would be required for proper evaluations of this prospect" and it was deceptive to state that "work done to date has not been sufficient to reach definite conclusions and *any* statement as to size and grade of ore would be premature and possibly misleading" (emphasis added). The tenor of the entire statement was misleading, and, the court thinks designedly so.

*Stout Case.*

Arthur R. Stout, Jr. and his wife owned 1,000 shares of TGS stock in joint tenancy, which had been purchased on February 5, 1962, at $21½ a share. Their order to sell was placed April 21, 1964, and the stock was sold the following day at $42 per share. Mr. Stout testified that the sale of the stock was motivated by information concerning the press release of April 12, 1964, which he received "probably within a week of the 13th." He had no recollection as to how he received the information, but from what he heard he "concluded that the officers of Texas Gulf Sulphur had stated that the discovery was overrated and exaggerated and that, as a result of their statements, the stock would (go down) in price, and therefore I sold it." Mr. Stout

---

20. In SEC Regulation Sec. 240.3b–3 the term "short sale" is defined as meaning "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller."

While Mitchell may have thought he was selling short, the transactions involving his sales of TGS stock were not treated by his broker as short sales. Mitchell owned 420 shares of TGS stock which he delivered to his broker who sold the same without delay. The Court has treated Mitchell's sales of TGS stock as ordinary sales.

testified that he had bought TGS stock for long-term appreciation; that he had no need for money when he sold it; and that the money received from the sale he put into a bank savings account. He stated: "I received that information. Whether I read it or heard it through the news media, I do not recall; but the essence of the information of the release is what I based the sale of my stock on."

One of the allegations in the Stout complaint is the following:

"Confused by conflicting reports issued by defendants of the value of the Kidd 55 segment, plaintiffs sold their 1,000 shares on or about April 22, 1964, at a price of $42.00 per share."

The Stouts ask for rescission, or, in the alternative, damages, contending that the actions of defendants in preparing, issuing and causing the news release dated April 12, 1964, to be published were fraudulent; that the release misstated or concealed the true facts concerning the magnitude of the mineral discovery; that defendants knew the facts given were incorrect and misleading and knew, or should have known, that the facts as stated would be relied upon by shareholders. The court thinks these statements constitute a fair appraisal of the nature, purpose and effect of the April 12, 1964, news release.

## DAMAGES

It is unnecessary for the court to make any determination as to whether defendants were required by the statute or the rule to disclose the results of drilling at any time prior to April 12, 1964. Likewise, nothing would be gained by exploring the question whether the wide-spread rumors in Canada and in this country gave rise to a duty on the part of the defendants to make a disclosure prior to that date.

The important fact is that defendants chose to issue a public statement, which both the statute and the rule required be accurate, fair and complete.

Instead, the press release issued by defendants was misleading, intentionally deceptive, inaccurate and knowingly deficient in material facts pertaining to the results of drilling. The record establishes that each of the plaintiffs relied upon the misleading and inaccurate announcement in making his decision to sell his TGS stock. Consequently, defendant Texas Gulf Sulphur must respond in damages.

The aim of courts in cases of this type is to put the plaintiffs in the positions they would have been in if they had not been motivated by defendants' fraudulent press release to sell their stock. In this connection it is significant to point to the periods of time plaintiffs had held their stock. Plaintiff Reynolds, when he sold 500 shares of TGS stock on April 16, 1964, had held 300 shares since January 7, 1960, a period of more than four years, and had held 200 shares since May 18, 1962, a period of 23 months. Plaintiffs Stout sold 1000 shares of TGS stock on April 21, 1964. They had held those shares since February 5, 1962, more than two years. Plaintiff Mitchell purchased 420 shares of TGS stock at various times during the period December 11, 1953 and May 17, 1962. Some of the 400 shares he sold on April 17, 1964, he had held for more than 10 years, some about two years.

The variety of situations in which a 10(b) or 10b–5 violation may be found makes it difficult to formulate a comprehensive rule of damages. In the case of J. I. Case Company v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 where violations of the Securities Exchange Act were involved, the Supreme Court observed that it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose, that where federally secured rights are invaded federal courts should adjust their remedies so as to grant necessary relief, and that they may use any available remedy to make good the wrong done.

Section 28(a) of the Securities Exchange Act [21] provides that "no person permitted to maintain a suit for damages under the provisions of this title shall recover * * * a total amount in excess of his actual damages * * *", but it provides no help in determining how "actual damages" are to be measured.

It seems to this court that the true and just measure of damages in these cases should be, with some qualification, what long ago came to be called the New York Rule. Of necessity, it was unthinkable that the common law rule in trover for the conversion of ordinary chattels, i. e., fair market value at time of conversion, should be applied in the case of corporate shares with rapidly changing values. So the rule evolved that the measure of damages in stock transactions is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time after the injured party received, or should have received notice of it, a time within which he has a reasonable opportunity to replace the stock. This was announced by the United States Supreme Court in a case decided in 1888 which arose in the Territory of Utah, Gallagher v. Jones, 129 U.S. 193, 194, 200–202, 9 S.Ct. 335, 32 L.Ed. 658.[22]

Factors considered in making the judgment on damages in this case include: the rapidity of price fluctuations in normal trading situations on the New York market, the excessive publicity, first having a tendency to depress the price of Texas Gulf Sulphur shares, and later to cause it to rise, the nature of the Texas Gulf Sulphur enterprise, that is, a mining venture carrying on world wide mineral explorations, about which there has been extensive continuing publicity, all of which reasonably might have been expected to cause stockholders' interest to be stimulated and to cause them to be on the alert for sudden changes in the quotations, and to exercise ordinary care, prudence, and diligence in watching out for their own interest, and to learn of the Texas Gulf Sulphur announcement of April 16.

The obligation of the plaintiff shareholder is to exercise ordinary and reasonable care and diligence to look out for himself. The notice required is that which he received, or should have received, in the exercise of reasonable care and diligence.

We must draw the line somewhere, and this is an attempt to give a twenty trading day period within which the average of the highest daily prices is the measure of damages, and a period within which the shareholders received, or should have received, notice of the Texas Gulf Sulphur announcement of April 16.

A few days, is too short a time reasonably to expect stockholders to make a judgment and sell their stock, and much too early to let the New York market reflect the true value, overstimulated upward or downward. The average of the highest daily sales for the 16th of April and 19 trading days subsequent thereto allows the market reactions more truly to reflect actual value and allows a more reasonable period of time within which to require the shareholders, in the exercise of ordinary diligence and prudence, to learn of the Texas Gulf Sulphur announcement of April 16 and to protect their interest.

There remain a couple of additional factors considered by the court in reaching the judgment in this case. They were suggested in Judge Henry J. Friendly's opinion in the Second Circuit, Securities and Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 864, 866–867.

Judge Friendly was speaking of "negligence" in the drafting of the release. Instead, the record here discloses that the press release issued by defendants was misleading, intentionally deceptive,

---

21. 15 U.S.C. Sec. 78bb(a).

22. The former rule of highest intermediate value up to time of trial was repudiated.

inaccurate and knowingly deficient in material facts.

One of the choices open to the corporation, if it decides to speak, is to tell the truth.

The measure of damages here adopted is calculated to result in fair, reasonable and just awards. The damages awarded are compensatory and not punitive or *in terrorem*. Plaintiffs are only to be made whole, not to be compensated twice. When plaintiffs recover compensation for their losses from Texas Gulf Sulphur their claims against Fogarty will be deemed paid, satisfied and discharged.

On the day, April 16, 1964, that TGS publicly acknowledged that it had made a substantial mineral discovery, its stock advanced nearly $7 to a high of $37. The following day it advanced to a high of $42, and on the next trading day it advanced to a high of $44. This was followed by a decline to a high of $41¼, then an increase of more than 5 points to a high of $47. On April 29, 1964, it reached a high of $59. After a number of declines and a few advances it reached $60.50 on May 18, 1964. The extent to which the stock fluctuated on each trading day, and from day to day, is apparent from the table set out in the footnote.[23]

In Section 151 of the Restatement of Restitution it is recognized that while generally the measure of recovery will be the value of the property at the time of its improper acquisition, retention or disposition, a "higher value" may be recognized "if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it." Comment c. to Section 151 explains:

"Where the subject matter is of fluctuating value and where the persons deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. This is true where the recipient knowingly deprived the owner of his property or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit. In such cases the person deprived is entitled to be put in substantially the position in which he would have been had there not been the deprivation, and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct. This is done if he can prove

23. The opening, high, low and closing prices of TGS stock for 20 trading days starting with April 16, 1964, are as follows:

| | | | Open | High | Low | Close |
|---|---|---|---|---|---|---|
| April 16, 1964 | " | (Thurs.) | 30⅛ | 37 | 30⅛ | 36⅜ |
| April 17, | " | (Fri.) | 39¾ | 42 | 38¾ | 40¼ |
| April 20, | " | (Mon.) | 42 | 44 | 41½ | 42¼ |
| April 21, | " | (Tues.) | 41 | 41¼ | 39⅛ | 40⅛ |
| April 22, | " | (Wed.) | 40½ | 47 | 40½ | 45½ |
| April 23, | " | (Thurs.) | 47¾ | 48¼ | 42⅛ | 42⅝ |
| April 24, | " | (Fri.) | 44 | 44¾ | 42¾ | 44¼ |
| April 27, | " | (Mon.) | 44⅞ | 47½ | 44⅝ | 47 |
| April 28, | " | (Tues.) | 47¾ | 52⅜ | 47¾ | 52⅜ |
| April 29, | " | (Wed.) | 54½ | 59 | 53½ | 56¾ |
| April 30, | " | (Thurs.) | 54½ | 58⅜ | 54½ | 54¾ |
| May 1, | " | (Fri.) | 55¾ | 56⅞ | 52½ | 52⅞ |
| May 4, | " | (Mon.) | 54½ | 54⅝ | 52⅛ | 52⅝ |
| May 5, | " | (Tues.) | 51¾ | 52 | 48⅜ | 48⅜ |
| May 6, | " | (Wed.) | 48¼ | 52¼ | 46⅜ | 52¼ |
| May 7, | " | (Thurs.) | 52½ | 53⅜ | 49½ | 49½ |
| May 8, | " | (Fri.) | 51½ | 54½ | 50¼ | 54⅛ |
| May 11, | " | (Mon.) | 54⅞ | 57 | 54⅝ | 56 |
| May 12, | " | (Tues.) | 55⅞ | 56⅜ | 53½ | 55 |
| May 13, | " | (Wed.) | 54¼ | 55⅞ | 51⅝ | 51⅝ |

that he probably would have made a sale while the subject matter was at its highest point in value * * .* "

In the wrongful conversion case of Nephi Processing Plant v. Talbot, 247 F.2d 771 (10th Cir. 1957) the Circuit Court held that while Utah courts have recognized that as a general rule the measure of damage for conversion of property is the value of the property at the time of conversion "the rule has no application where the converted chattels are of a kind which have a fluctuating market value." In such cases, the court said, "the measure of damages is the highest market price of the property within a reasonable time after the owner has notice of the conversion".

What a "reasonable time" may be will vary from case to case. Here, a period of wide-spread rumors about a mineral discovery was followed by the deceptive and inaccurate press release published April 13, 1964, and the public announcement of a major discovery on April 16, 1964. On that day the price of TGS stock jumped about $7, and for the next 9 trading days the stock steadily increased, except for two days on each of which the closing price of the stock decreased about $2. On the 10th trading day (including the day of the announcement) the stock had advanced from approximately $30 to a high of $59. During the ensuing 11 days the stock fluctuated considerably and then climbed to a new high for this period of $60.50 on May 18, 1964.

In the circumstances of these cases the court considers that a reasonable period would be 20 trading days including April 16, 1964, the day of the announcement.

If the plaintiffs had not been led to sell their TGS shares and learned on April 16th, through the TGS announcement, of the proportions of the discovery, it would be highly improbable, to say the least, that any one of them would have sold at the highest price.

The court deems it fair and just therefore, to take the average of all of the highest market prices on the 20 trading days, rather than the single highest market price during the period.

The average of the high market prices during such 20-day period is $50.75, which the court adopts as the measure of damages in these cases.

Damages to be awarded to Plaintiff Reynolds are computed by deducting from $50.75 the price he received for each share, $33.625, and multiplying the resulting figure of $17.125 by 500, the number of shares he sold, to arrive at damages of $8,562.25. Interest on that amount at the rate of 6% per annum from the date he sold his stock to the date of judgment is allowed.

Similarly, damages for Plaintiff Mitchell are computed by deduction from $50.75 the amount received by him for each share and multiplying the resulting figure by the number of shares to arrive at damages of $4,390.00. In the case of Plaintiffs Stout, damages are awarded in the sum of $8,750.00, arrived at in the same manner. In each case interest is awarded at the rate of 6% per annum on the damages from the date on which the TGS shares of stock were sold to the date of judgment.

The court does not overlook the claims of the Stouts that (1) they did not learn of the "possibility" of an action against defendants until "on or after July 12, 1966" and (2) that they "did not become aware of or learn of the defendants' unlawful actions in connection with the issuance of the April 12, 1964, press release until on or about July 12, 1966." Aside from doubts the court has as to the credibility of these claims, he believes that in the circumstances of this case the Stouts knew, or should have known, of the misrepresentations and deceptions in the April 12, 1964, release within a period of 20 trading days.

## STATUTE OF LIMITATIONS

 There is no federal statute of limitations which is applicable to violations of Section 10(b) of the Act or of Rule 10b–5, consequently the Utah statute of limitations, 78–12–26(3) Utah

Code Annotated, 1953, controls. It provides:

"Within three years: * * *

"(3) An action for relief on the ground of fraud or mistake; but the cause of action in such case shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake. * * *"

The action brought by Plaintiff Reynolds was filed July 12, 1966, and the action brought by Plaintiffs Stout was filed April 7, 1967. Each of these actions was clearly within the statutory period.

The action commenced by Plaintiff Mitchell was filed April 17, 1967. Defendants contend this action should be dismissed as having been filed too late. Mitchell, a C.P.A., testified at the trial that on April 16, 1964, the first free day after the close of the income tax season, he visited one of his brokers and for the first time learned of the press release of April 12, 1964. He went back to his office, obtained the certificate for 400 shares of TGS stock and took it to another broker and gave him an order to sell. At that time he realized he had an additional 20 shares and he told the broker he would bring them in the next day, which he did and gave the order to sell the 20 shares on April 17. He testified that at the time he gave the orders to sell he knew of no press release from TGS other than that of April 12, 1964. In a deposition taken by defendants, Mitchell testified in response to questions as follows:

"Q. Do you recall any conversation with Mr. Lewis with respect to your Texas Gulf Sulphur stock after the conversation on the 16th at approximately 1:00 o'clock or 1:30 that you have just described to us?

"A. You mean that same week?

"Q. Yes, any time.

"A. Yes, I believe it was Wednesday or Thursday of the following week that I think Mr. Singer told me—I am not too sure—or did I read it in the Wall Street Journal something to the effect that a new release had come out on the 16th."

The court has examined and considered the testimony of Mr. Mitchell and the rather extensive depositions taken by defendants of Mitchell and his brokers, and has concluded that the above quoted testimony should be accepted. Consequently, Mitchell's action was filed within the time limit set by the Utah statute.