Jerry D. FRIDRICH, et al.,
Plaintiffs-Appellees,

v.

J. C. BRADFORD, et al.,
Defendants-Appellants.

No. 74–1902.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1975.

Decided Sept. 15, 1976.

Certiorari Denied Jan. 10, 1977.
See 97 S.Ct. 767.

Ames Davis, Waller, Landsen, Dortch & Davis, Justin P. Wilson, William Waller, William Waller, Jr., Nashville, Tenn., for defendants-appellants.

Gilbert S. Merritt, Gullett, Steele, Sanford, Robinson & Merritt, Nashville, Tenn., James C. Burns, Jr., Shelbyville, Tenn., for plaintiffs-appellees.

Before CELEBREZZE, PECK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

On April 27, 1972 J. C. Bradford, Jr. purchased 1,225 shares of common stock of Old Line Life Insurance Company (Old Line). The shares were purchased on inside information Bradford, Jr. had received on a tip from his father. The shares were purchased on the over-the-counter market from J. C. Bradford and Co., a Nashville brokerage firm of which Bradford, Jr. and his father are managing partners. Subsequent to the purchase, Old Line stock increased in value and on July 27, 1972, Bradford, Jr. sold the 1,225 shares, reaping a profit of $13,000 on the transaction.

The Securities and Exchange Commission investigated Bradford, Jr.'s stock transaction. As a result of a consent decree entered into between the Commission and Bradford, Jr., he was required to disgorge the entire $13,000 profit, was permanently enjoined from any further violation of § 10(b) of the Securities Exchange Act of 1934[1] and Rule 10b–5,[2] and was suspended from performing any business activities as a broker-dealer for twenty working days.

Thereafter plaintiffs filed this civil action, alleging that Bradford, Jr.'s trading activities violated Rule 10b–5. By the judgment of the district court appealed from here, Bradford, Jr. has been rendered jointly and severally liable to plaintiffs for the sum of $361,186.75. He has been held liable, although plaintiffs never sold their stock to him or his associates, nor did they sell on the same day or even in the same month in which he bought. There was no proof that Bradford, Jr.'s trading activities had any impact upon the market price of Old Line stock or upon plaintiffs' decision to trade in it. As we read the district court judgment, Bradford, Jr.'s liability would have been the same even though he had

---

**1.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   \*    \*    \*    \*    \*    \*

   (b) To use or employ, in connection with the purchase or sale of any security registered on an national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such *rules and regulations as the Commission* may prescribe as necessary or appropriate in the public interest or for the protection of investors.

June 6, 1934, c. 404, § 10, 48 Stat. 891.

**2.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. (Sec. 10; 48 Stat. 891; 15 U.S.C. § 78j) [13 F.R. 8183, Dec. 22, 1948, as amended at 16 F.R. 7928, Aug. 11, 1951]

purchased only five shares of Old Line and made a profit of less than $53.00.

While Bradford, Jr. is only one of five defendants in this appeal, we have focused on his liability at the outset in order to illustrate the "Draconian liability"[3] to which persons who trade on inside information may be subjected under the district court's interpretation of Rule 10b–5. Because we conclude that under the circumstances of this case imposition of civil liability constitutes an unwarranted extension of the judicially created private cause of action under Rule 10b–5, we reverse the judgment of the district court.

## I.

Of the five defendants named[4] in the district court action, the dominant figure was James C. Bradford (Bradford). In 1961, Bradford put together a syndicate to purchase a controlling block of Old Line stock, which the syndicate continued to own through 1972. After the purchase, Bradford became a director of Old Line and upon his retirement as a director, was succeeded by Bradford, Jr., who remained a director until August 1972. Approximately once a year Bradford was visited in Nashville by Forrest Guynn, president of Old Line, who gave Bradford a personal report on the affairs of the company. After the 1961 purchase, Bradford & Co. became the principal market-maker of the stock.[5]

Prior to 1972, Old Line was considered a prime target for merger or takeover in the insurance industry and Bradford, because of his relationship with Old Line, was often approached by companies interested in a takeover.

In October, 1971, Gordon E. Crosby, chairman of U. S. Life Corporation (USLIFE), a New York based insurance company, contacted Bradford concerning the possible acquisition of Old Line by USLIFE. Crosby was advised by Bradford that no

**3.** See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 242 (2d Cir. 1974).

**4.** The five named defendants are J. C. Bradford, J. C. Bradford, Jr., J. C. Bradford and Co., J. C. Bradford & Co., Inc., and Life Stock Research Corp. J. C. Bradford & Co., Inc. is a corporation wholly owned by the partners of Bradford & Co. and controlled by Bradford & Co. as a partnership entity. Life Stock Research Corp. is a registered investment company. During 1972, and for several years prior thereto, J. C. Bradford & Co., Inc. owned 81% of the voting capital stock of Life Stock. The defendants owned as much as 17% of the outstanding stock of Old Line during the period in question.

**5.** The market in Old Line stock was described by the district court in its findings of fact:
The market in Old Line stock was maintained in the over-the-counter market, an essentially anonymous market like the market for securities maintained by the New York Stock Exchange and other securities exchanges. The New York Stock Exchange is an auction market so that for a New York Stock Exchange listed security, there is a specialist or market-maker on the floor of the Exchange who handles the transactions in a particular stock. A trade is consummated when a broker with an order from his customer to buy or sell a security goes to the specialist who either matches the order against one or more buy or sell orders placed with him by other brokers, or, if necessary, if there is an imbalance in the market, the specialist buys or sells the stock for his own account in order to make the market. The specialist is obligated to buy and sell securities at quoted prices in order to maintain the market in a security. In the over-the-counter market, a market in a security is maintained in basically the same way as on an Exchange, except that in the over-the-counter market, there may be more than one specialist or book in the stock. This specialist is called a market-maker and he offers and obligates himself to buy and sell a particular security at quoted prices. Such a specialist or market-maker advertises his quotations by placing bid and asked quotations on the security in the "NASDAQ" system or the "pink sheets" published daily by the National Quotations Bureau. A broker with an order to buy or sell a security in the over-the-counter market, as on the New York Stock Exchange, would contact a specialist or market-maker. This would usually be done by telephone instead of on the floor of the Exchange. The market-maker would buy or sell the security based on his quotations, adjusting his prices on the basis of the supply and demand for the stock. The market-maker in the over-the-counter market, just as on the New York Stock Exchange, is risking his own capital, seeking to make a profit from his trading activity by judging the demand and supply of the stock and the direction of the price.

offer would be considered unless it involved an offer of at least $50 per share for Old Line stock. Since Old Line had a market price of only $24 per share at that time, Crosby did not pursue the negotiations.

On April 19, 1972 Crosby telephoned Bradford and stated that he was then in a position to work out a deal at better than $50 per share of Old Line stock. Crosby, in effect, proposed an acquisition on the basis of one share of USLIFE stock for one share of Old Line. In a letter of April 21, 1972, Crosby agreed to negotiate the acquisition only with Bradford and agreed to pay Bradford a finder's fee equivalent to 1% of the fair market value of the USLIFE stock exchanged for the Old Line stock. On April 19, 1972 the closing bid price for Old Line stock was $33 per share and the closing price for USLIFE on the New York Stock Exchange was $61 per share.

On April 21, 1972, after his conversations with Crosby, Bradford caused to be purchased for the account of his wife 2,000 shares of common stock of Old Line, at an average price of about $34 per share. Between April 21 and April 26, Bradford made several purchases totalling 5400 shares of Old Line for the account of Life Stock Research Co. (Life Stock) at an average price of about $36 per share. On April 27, 1972, after hearing of Bradford's conversations with Crosby, Bradford, Jr. purchased 1,225 shares of common stock of Old Line at $37 per share. Prior to their April, 1972 purchases, the Bradfords had made only one purchase of Old Line stock in the past eight years, that in 1969.

On May 15, 1972 Bradford called Crosby and told him that he had spoken to Forrest Guynn, chief executive officer of Old Line.

Bradford reported that Guynn was interested in having serious negotiations concerning the merger. Because Old Line was going to declare a 20% stock dividend, the ratio of exchange would have to be changed to 8/10 of a share of USLIFE per one share of Old Line, but Bradford saw this as presenting no problem.

Negotiations toward the merger continued in June, 1972. Bradford's finder's fee agreement granting him the right to receive 1% of the fair market value of the USLIFE stock exchanged was signed on June 26. Crosby of USLIFE and Guynn of Old Line met on June 28–29 and issued a press release on June 29 in which the terms of the acquisition offer were stated,[6] without mention, however, of the finder's fee. The June 29, 1972 press release was the first public announcement of the proposed merger. On July 7, 1972, Guynn, with the authorization of Old Line's Board of Directors, agreed in principle to the merger of Old Line and USLIFE. On July 11 a press release announcing the agreement in principle was issued and this was delivered to stockholders on July 14. Because of problems concerning SEC approval of the merger, the proposed date of the merger, September, 1972, had to be delayed.[7] Also, because the SEC would not approve Bradford's finder's fee without a hearing, Bradford waived his fee in return for an increase in the exchange rate on the stock from 0.8 to 0.808 of the USLIFE stock per share of Old Line. After an investigation of several months, the SEC approved the merger on November 20, 1972 and on December 28, 1972, after approval by Old Line's stockholders, the merger became effective.

**6.** The press release of June 29, 1972 issued by Crosby concerning the proposed acquisition of Old Line by USLIFE was reported in the Wall Street Journal on June 30, 1972. That story read in part:

Reached in Milwaukee, Forrest D. Guynn, President of Old Line Life, said he "could be" surprised at the offer. "I haven't had that much opportunity to study USLIFE's figures at all," he said, stating that for that reason he couldn't comment further.

Under the terms presented to Old Line, USLIFE would acquire each Old Line outstanding share for 0.8 share of USLIFE common. The transaction would involve 1,036,000 USLIFE shares, the company said.

**7.** Old Line and USLIFE determined that the merger could not be consummated unless the SEC entered an order pursuant to § 17(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(b), exempting the merger from the provisions § 17(a) of the Act.

Bradford and Co. was the principal market maker in Old Line stock throughout 1972, purchasing 169,054 shares and selling 170,685 shares, for which it was paid commissions in the amount of $103,214. Approximately $75,000 of this profit was a result of trading activity in Old Line during the months of April through December, 1972.

On July 31, 1972, Bradford, Jr. sold the 1,225 shares of Old Line stock he had purchased in April 1972 at a profit of $13,000. On August 24, 1972, Life Stock sold the 5400 shares purchased for it in April, realizing a profit of approximately $103,000 on the transaction. The 2,000 shares Bradford had purchased for his wife were not sold prior to the merger, but on the last business day prior to the merger there was an unrealized appreciation in the value of those shares amounting to approximately $74,000 based upon the bid price of Old Line stock on that date.[8]

Two of the plaintiffs (Fridrich and Kim) bought stock in Old Line in May, 1972 and sold the stock in June at a slight profit.[9] The stock was purchased from a broker, Ken Schoen, and was sold on his advice. These transactions did not involve Bradford or any of his associates. The other plaintiffs (the Woosley family) purchased their stock from Bradford & Co. in 1967 but sold in June, 1972, through Schoen and on his advice. Schoen testified he would not have advised clients to sell their stock had he been aware that Bradford and Old Line were negotiating an agreement with US-LIFE to effect a merger. Schoen did not

have any information concerning the proposed merger until mid-July, 1972. He did not advise the plaintiffs to repurchase Old Line stock.

Meanwhile the SEC commenced an investigation of the transaction. Hearings were held before the Commission in early November, 1972 and on November 10, 1972, the SEC filed a Rule 10b–5 enforcement action against Bradford, Bradford, Jr., Life Stock, Bradford & Co. and Bradford & Co., Inc. in the United States District Court for the Southern District of New York.[10] The action was terminated by the filing of a stipulation of settlement and the entry of a consent judgment on June 1, 1973. That judgment permanently enjoined the defendants from directly or indirectly violating Section 10(b) in connection with the purchase or sale of securities issued or to be issued by Old Line. It further ordered that a fund created by a November 27, 1972 escrow agreement should be held and dispersed to such persons as should file their claims under the terms thereof.[11] Those entitled to file claims were defined by the judgment as:

(a) Any person other than a customer of J. C. Bradford and Co. who sold any shares of Old Line to J. C. Bradford and Co. in the period from April 21, 1972 to April 27, 1972, and

(b) Any customer of Bradford & Co. who sold any shares of Old Line to J. C. Bradford and Co. in the period of April 21, 1972 to June 29, 1972.

The judgment provided that to the extent not objected to, the escrow agent should

---

8. Had the defendants sold the Old Line stock which they had purchased on June 29, 1972, the date upon which the press release containing the first public information concerning the merger was issued, their profits would have been lower. Based upon the bid price for Old Line on that date, Bradford, Jr. would have realized a profit of $13,475, Life Stock a profit of $64,800 and Bradford a profit of $27,750, for a total profit of $96,025.

9. Although these plaintiffs sold their shares at a price lower than that at which they purchased it, they made a slight profit on the transaction due to the 20% stock dividend de-

clared in the interim between their purchase and sale.

10. *Securities and Exchange Commission v. James Cowdon Bradford, et al.*, No. 72 Civ. 4776 (S.D.N.Y.1972).

11. After the SEC commenced its enforcement action on November 10, 1972, Bradford, Bradford, Jr. and Life Stock entered into an escrow agreement whereby they deposited with the Third National Bank in Nashville certain funds to be disbursed to any claimants found to be entitled thereto under any judgment entered against these defendants.

promptly, after August 31, 1973, "pay all claimants the difference between the price at which claimants sold Old Line stock to J. C. Bradford and Company and $40 per share after appropriate adjustment for stock dividend." In execution of the provisions of the judgment, the escrow agent paid to 25 claimants who qualified under Subsection A of the judgment a total of approximately $97,200. The escrow agent further found that between June 7 and July 31, three dealers in securities had filed claims with him under Subsection B and were entitled to be paid approximately $31,000. Thus, by the judgment as finally carried out, the defendants agreed to and paid a total of $127,567.94, an amount $15,629.69 in excess of the amount then in the escrow fund.[12]

By the earlier stipulation of settlement, Bradford and Bradford, Jr. consented to the entry by the Commission of orders suspending them for a period of 60 and 20 business days respectively from being associated with a broker, dealer, or investment advisor.

## II.

On April 25, 1973 a complaint was filed in the United States District Court for the Middle District of Tennessee by plaintiffs Fridrich, Kim and the Woosleys. The complaint charged defendants with violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 because of their trading in Old Line stock while in possession of material inside information. The complaint also charged defendants with violation of

§§ 9(e), 10(b) and 15(c) of the Securities Exchange Act, alleging that defendants had manipulated the market in Old Line stock by virtue of their position as market makers of the stock.

The case was submitted for decision on the merits to the district judge upon several stipulations of fact and upon certain other evidence including depositions of the principals taken in the hearings before the Securities and Exchange Commission.

Without making any particular distinction between the defendants, the district court found that all had violated Rule 10b–5 by trading in Old Line stock while in possession of material inside information, without first disclosing the information to the investing public trading in the same market. The court also found that Bradford, Bradford, Jr. and Bradford and Co. had violated Rule 10b–6 [13] by virtue of their continuous trading activity in Old Line stock from April through November, 1972, the period in which the terms of the merger were being established.

Turning to the issue of damages, the district judge made this finding:

Each plaintiff sold Old Line stock during the period of nondisclosure and is therefore entitled to damages as a result of defendants' nondisclosure in violation of Rule 10b–5 and market-manipulation in violation of Rule 10b–6. The measure of damages is the difference between the price each plaintiff received for his shares sold during the period of nondisclosure and manipulation and the highest value

---

12. The $15,629.69 was paid by Bradford & Co. The record does not reflect whether it recouped any part thereof from the other defendants.

13. Rule 10b–6 provides in relevant part:
   (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the act for any person,
   (1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or
   (2) Who is the issuer or other person on whose behalf such a distribution is being made, or
   (3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or

indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution. . . .

The complaint itself made no mention of Rule 10b–6.

reached by Old Line stock within a reasonable time after the tortious conduct was discovered and the disclosure made of the information wrongfully withheld. The highest bid value reached by Old Line stock within a period of 20 days following the SEC's action on November 10, 1972, disclosing the defendants' wrongful conduct on the SEC's action giving approval to the merger on November 20, 1972, was $58 a share reached on November 21, 1972 and on December 8, 1972.

Based upon this measure of damages,[14] the district judge entered judgment against defendants and in favor of plaintiffs in the aggregate amount of $361,186.75. The district judge thus held that insiders who buy in an impersonal market using material inside information can be liable to sellers in an impersonal market who sold without knowledge of the inside information, even though it was undisputed that the insiders did not purchase the shares sold by the plaintiff sellers. In addition, he held that insiders who continue normal market making activities[15] in the stock in a corporation while negotiations concerning a merger of that corporation are ongoing, can be liable to persons trading in the stock, even though those persons did not trade with the market maker. Finally, on the issue of damages, the district court held that such defendants can be liable in damages in an amount far in excess of the profits they made from the illegal purchases of stock from their market making activities.[16]

We have set down the complicated facts before the district court in considerable de-

**14.** It can be seen that the district judge thereby determined that the period of non-disclosure did not end with public announcement of the merger itself, but continued to include what the court conceived to be the period of non-disclosure of Bradford's abortive efforts to obtain a finder's fee.

**15.** In their complaint, plaintiffs charged that defendants had actively manipulated the market in Old Line stock:

As a result of their dominant position as market-maker and specialist in the stock of Old Line, the defendants, during the period of their illegal nondisclosure and trading activity, influenced the price of the stock to their own advantage and plaintiffs' detriment by holding the market price at a low level after an initial rise in the price of the stock caused by their illegal insider purchases during April, 1972. By reducing the price level of the stock, the defendants created the impression that the market price was declining, at a time when the merger was imminent and the real value of the stock was almost double the artificial market price maintained by defendants, thereby inducing stockholders in the position of plaintiffs to sell before a further price decline.

The district court, in finding a violation of Rule 10b–6, did not find such active market manipulation as described in the complaint above. Rather, it concluded that the merger negotiated here constituted a distribution of securities under Rule 10b–6 and that it was market manipulation for defendants as broker-dealers to trade in the securities while participating in the merger negotiations. We have found no evidence in the record to support the charge that the defendants manipulated the price of Old Line stock as described in plaintiff's complaint.

**16.** Plaintiffs have contended on this appeal that defendants' total profit on their illicit transactions was well in excess of the amount which plaintiffs were awarded as damages. This contention stems from the fact that defendant Bradford negotiated the merger between US-LIFE and Old Line, the result of which was to exchange 60,000 of his own shares of Old Line for USLIFE shares. As a result of the exchange, the value of Bradford's investment increased by over $1,500,000.

The district judge found that Bradford's conduct in negotiating the merger which increased the value of his investment itself constituted unlawful trading activity in Old Line stock. We disagree. Bradford had owned the shares in question for several years. We do not think that he was precluded from helping to negotiate a merger which had the effect of increasing the value of the investment of *all* shareholders in Old Line. Such a rule would preclude corporate officers or insiders who own stock in the corporation from participating in merger negotiations even though a merger might be in the best interests of the corporation. We have found no authority for such a proposition and consider it to be against the sound public policy of encouraging stock ownership by corporate officers. We thus hold that Bradford's participation in merger negotiations did not constitute a violation of Rule 10b–5 even though an effect of that merger was to increase the value of his investment in Old Line by a substantial amount.

tail to illuminate the setting in which the issues arise. We think, however, that the issues themselves are more simply stated. In the final analysis, the question is how far the courts are to extend the private civil right of action under Section 10(b) and Rule 10b–5 when the alleged violation is the unlawful use of inside information and the stock involved is traded upon an impersonal market.

### III.

Section 10(b) of the 1934 Act does not expressly provide a civil remedy for its violation. As noted by Justice Rehnquist in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 729–730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), there is no indication that Congress at the time it passed the 1934 Act considered the issue of private suits under § 10(b). Nor is there any indication that the Securities and Exchange Commission, in adopting Rule 10b–5, considered private civil actions under the rule. Nevertheless, since the seminal decision in *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946), in which a private civil remedy under § 10(b) was first judicially implied, a steady expansion of that remedy by the federal courts has occurred.[17]

In *Kardon, supra,* the court found an implied cause of action under Rule 10b–5 based upon the law of torts. Citing § 286 of the Restatement of Torts, the court noted that "[T]he disregard of the command of a statute is a wrongful act and a tort." 69 F.Supp. 512, 513. The court found judicial support for its decision in *Texas and Pacific Ry. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), in which the Supreme Court for the first time recognized an im-

plied private right of action for violation of a federal regulatory statute:

> . . . disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied . .

241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874.

Since *Kardon, supra,* courts have allowed a private right of recovery based upon a tort theory of liability. *See, e. g., Mitchell v. Texas Gulf Sulphur Company,* 446 F.2d 90, 97 (10th Cir. 1971) *cert. denied* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558; 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), A. Bromberg, Securities Law: Fraud—SEC Rule 10b–5, § 2.4(1)(2) at 30 (1960) (hereinafter Bromberg). Under the tort theory, while the private right of action is viewed as a necessary supplement to SEC action, *cf. J. I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and as encouraging enforcement of the provisions of the Securities Exchange Act, its primary purpose is to compensate plaintiffs for damages caused by defendant's illegal acts.[18]

### IV.

Few early cases brought under § 10(b) and Rule 10b–5 dealt with non-disclosure by insiders trading in the open market.[19] Development of the law in this area is largely traceable to the "abstain or disclose rule" developed in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968), *cert. den.,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).[20] This was an SEC enforcement

---

17. As noted by Justice Rehnquist in *Blue Chip Stamps, supra,*

    "When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn."

    421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539.

18. *See* Comment, *Damages to Uninformed Traders for Insider Trading on Impersonal Exchanges,* 74 Colum.L.Rev. 299, 304 (1974).

19. *See* Bromberg, *supra,* § 7.4 n. 98.

20. The *Texas Gulf Sulphur* decision was preceded by the decision of the SEC in *Matter of Cady, Roberts and Co.,* 40 S.E.C. 907 (1961). In that case the SEC indicated clearly that a violation of Rule 10b–5 could arise from nondisclosure of material facts, in other than a face-to-face transaction.

action brought under 15 U.S.C. §§ 78u and 78aa against Texas Gulf Sulphur Co. (TGS) and thirteen individuals who, it was charged, purchased TGS stock or calls on the strength of undisclosed inside information of favorable exploratory drilling results by the company near Timmins, Ontario. Noting that an important purpose of Rule 10b-5 was to help insure that all persons trading on the securities markets have relatively equal access to material information, Judge Waterman observed:

> The essence of the Rule is that anyone who, trading for his own account in the securities in a corporation has "access, directly or indirectly to information intended to be available only for a corporate purpose and not for the personal benefit of anyone" may not take "advantage of such information knowing it is unavailable to those with whom he is dealing," i. e., the investing public. . .

\*   \*   \*   \*   \*   \*

Thus, anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such information remains undisclosed.

*SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848. *SEC v. Texas Gulf Sulphur, supra,* involved an SEC enforcement action against the company and several corporate investors. That particular case did not involve an attempt to impose civil liability for damages upon insiders who trade in the open market without disclosure of inside information.

An early effort to impose civil liability in the context of non-disclosure of inside information is found in *Joseph v. Farnsworth Radio and Television Corp.,* 99 F.Supp. 701 (S.D.N.Y.1951) *aff'd* 198 F.2d 883 (2d Cir. 1952), where District Judge Sugarman framed the issue thus:

> The issue is narrowed to merely this: May A, who purchased stock of the F Corporation on November 12th and B, who likewise purchased stock of the same corporation on December 13th, each on a national stock exchange and each at a price higher than he would have paid therefor had he known the true financial condition of F, recover from C, D and E, the directors and officers of the corporation, the difference between that paid and that which would have been paid had C, D and E disclosed, between the previous March 19th and October 30th when they were unloading their own stock in F, that F was in a straitened financial condition?

99 F.Supp. 701, 706. In granting a defense motion to dismiss for failure to state a claim upon which relief could be granted, Judge Sugarman observed:

> Nothing in the history of the Act or the Rule permits the far-reaching effect sought herein by the plaintiffs. A semblance of privity between the vendor and purchaser of the security in connection with which the improper act, practice or course of business was invoked seems to be requisite and it is entirely lacking here.

99 F.Supp. at 706.[21]

---

**21.** The Second Circuit affirmed the district court judgment in *Farnsworth* on a divided vote. The majority felt the judgment could be affirmed on the basis of the district judge's opinion and upon the decision in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952). We have seriously considered but have declined to place final reliance upon any claim of lack of standing within the meaning of *Birnbaum, supra,* or *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). While plaintiffs were all sellers of stock in Old Line during the period of non-disclosure, none of them sold directly or indirectly to the defendants. Thus it could be argued the plaintiffs here did not possess standing to sue under § 10(b) because the wrongful activity of defendants was not "in connection with" plaintiffs' sales. While the facts here are distinguishable from those in *Birnbaum* and *Blue Chip,* we recognize that this may not end the standing issue, even then. *Birnbaum* excludes certain classes of investors; it does not confer standing on all other classes

A similar result was reached, but for different reasons, in *Reynolds v. Texas Gulf Sulphur Co.,* 309 F.Supp. 548 (D.Utah 1970), *aff'd as modified,* 446 F.2d 90 (10th Cir. 1971), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 754; 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), a private 10b–5 action arising out of the same transactions challenged by the SEC in *SEC v. Texas Gulf Sulphur Co., supra.* There one of the plaintiffs, Lawrence A. Karlson, sought damages for profits he claimed to have lost when he sold his TGS stock on December 11, 1963. It was established, in particular, that the defendant Fogarty, a vice-president of TGS, had purchased TGS stock prior to and after Karlson had sold his shares without publicly disclosing the inside information he possessed. Both Karlson and Fogarty had traded through a national stock exchange. The district judge noted that there was no face-to-face transaction and that Fogarty did not purchase the particular shares sold by Karlson. In denying recovery to Karlson, the district judge noted that while it was not necessary that he establish privity of contract in order to re-cover, it was nevertheless necessary for Karlson to prove "some causative effect":

In the case brought against Texas Gulf Sulphur Company, Fogarty and other TGS officials and employees, by the Securities and Exchange Commission, the Circuit Court found that Fogarty had violated Section 10(b) and Rule 10b–5 by purchasing TGS stock without publicly disclosing the insider information he possessed. It does not follow that such purchases by Fogarty, some of which were made prior to the time Karlson sold his stock, caused any damage to Karlson, and the record before us does not support any such contention.

309 F.Supp. 548, 558 (Footnote omitted).[22]

A different result has been indicated in *Shapiro v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 353 F.Supp. 264 (S.D.N.Y. 1973) *aff'd,* 495 F.2d 228 (2d Cir. 1974). In *Shapiro, supra,* plaintiffs were purchasers of common stock of Douglas Aircraft Corporation during the period of June 20–24, 1966 on the New York Stock Exchange. On June 24, 1966, public disclosure was made by Douglas of a drastic change in its

of investors. We agree with Justice Douglas that "Generalizations about standing to sue are largely worthless as such", *Data Processing Service v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969), and with Judge Tamm that standing to sue is "one of the most amorphous concepts in the entire domain of the public law." *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859, 861 (1970). In one sense, our finding here that defendants' wrong caused no damage to plaintiffs amounts to a finding that that challenged action has not caused these plaintiffs "injury in fact, economic or otherwise", an essential element of standing within the meaning of *Data Processing Service v. Camp, supra,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184. Again, in the sense that standing looks to the status of plaintiffs as a class of suitors, it is certainly true that our decision here, which in effect refuses to expand broadly the class of plaintiffs who may sue under Rule 10b–5, is intended to avoid many of the same dangers foreseen by Justice Rehnquist in *Blue Chip Stamps, supra,* 421 U.S. 723, 738–748, 95 S.Ct. 1917, 44 L.Ed.2d 539.

**22.** Karlson did not appeal the district court judgment denying him relief; therefore, the causation issue was not presented to the Tenth Circuit. One other court has in dictum ad-dressed the problem presented here and concluded that plaintiffs trading on an impersonal market would have no cause of action under Rule 10b–5 because of the lack of any causal connection between the injury to plaintiffs and defendants' misconduct. In *Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 315 F.Supp. 42 (D.Colo.1970) *rev'd on other grounds,* 474 F.2d 514 (10th Cir. 1973), Judge William E. Doyle stated:

Turning to plaintiff's second theory, the theory of tipping and insider trading, defendants contend that as a matter of law no claim for relief exists under the facts alleged by plaintiff. It is doubtful that tipping which results in insider trading on a national exchange can support a private action for damages under 10b–5. Where a corporation withholds material information from the public, a certain number of persons trading on the basis of insufficient information will be injured. This injury is not increased if corporate insiders who possess inside information are trading on the exchange at the same time. It is the incomplete information, not insider trading, which is the proximate cause of the damage to other investors.

315 F.Supp. 42, 44.

financial situation which had occurred since June 7, 1966, the date of the release of its earnings report for the first five months of 1966. That report indicated a favorable earnings picture. Between June 16 and June 20 the management of Douglas learned that, contrary to the June 7 release, Douglas would be reporting substantially lower earnings for the first six months of fiscal 1966 and that there would be little or no profit for the company during that year, with substantially reduced earnings for fiscal 1967. Defendant Merrill Lynch was engaged by Douglas as a managing underwriter for a proposed offering by Douglas of $75,000,000 in convertible debentures. Presumably because of this relationship, the information of the changed earnings picture was promptly transmitted to Merrill Lynch but without public disclosure. Plaintiffs alleged that thereafter, between June 20 and June 24, 1966, Merrill Lynch and certain of its directors and employees divulged this inside information to certain of their institutional investors who, in turn, sold their Douglas common stock on the New York Stock Exchange without disclosing the inside information to the public.

In an extensive and carefully drafted opinion, District Judge Charles H. Tenney denied a defense motion for judgment on the pleadings, holding that if the allegations were proved, they would amount to violations of Section 10(b) and Rule 10b–5 and render the defendants liable to the plaintiffs who, during the period of June 20–24, purchased Douglas stock in the open market without knowledge of the earnings information which was in the possession of the defendants.

In *Shapiro*, plaintiffs did not allege that they had actually traded with the defendants. Neither does it appear from the opinion that defendants' act of trading had any influence upon their own decision to purchase. In their motion to dismiss, defendants contended that their violation of Rule 10b–5, even if proved, did not cause any damage to plaintiffs and that since plaintiffs would have bought the stock in any event, no injury to plaintiffs was occa-

sioned. Judge Tenney rejected this analysis:

But therein lies the fallacy of defendants' reasoning: it is not the act of trading which causes plaintiffs' injury, *it is the act of trading without disclosing material inside information which causes plaintiffs' injury.* Had Merrill Lynch and the individual defendants refrained from divulging the earnings information to the selling defendants, or had the selling defendants decided not to trade, there would have been no liability for plaintiffs' injury due to the eventual public disclosure of Douglas' poor financial position. But defendants did not choose to follow that course of action, and by trading in Douglas stock on a national securities exchange they assumed the duty to disclose the information to all potential buyers. It is the breach of this duty which gives rise to defendants' liability.

353 F.Supp. 264, 278.

The Second Circuit, in affirming the district court judgment, agreed with Judge Tenney's analysis and further concluded that any argument defendants might make that their conduct did not cause plaintiffs' damage was precluded by the Supreme Court holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972):

The short, and we believe conclusive, answer to defendants' assertion that their conduct did not "cause" damage to plaintiffs is the "causation in fact" holding by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 [92 S.Ct. 1456, 31 L.Ed.2d 741] (1972), upon the authority of which we conclude that the requisite element of causation in fact has been established here by the uncontroverted facts that defendants traded in or recommended trading in Douglas stock without disclosing material inside information which plaintiffs as reasonable investors might have considered important in making their decision to purchase Douglas stock.

495 F.2d 228, 238. While neither court endeavored to rule upon the measure of any

damages which might ultimately be allowed, the Second Circuit observed:

> Moreover, we do not foreclose the possibility that an analysis by the district court of the nature and character of the Rule 10b–5 violations committed may require limiting the extent of liability imposed on either class of defendants.

*Shapiro v. Merrill Lynch, supra,* 495 F.2d 228, 242.

Thus it appears that both the district court and the Second Circuit in their respective opinions in *Shapiro, supra,* were ready and willing to extend the 10b–5 private right of action to accord relief to those who traded upon an impersonal market where the defendants were charged with violation of the "abstain or disclose" rule in *SEC v. Texas Gulf Sulphur, supra.*

As the foregoing cases illustrate, extension of the private civil remedy under Rule 10b–5 where shares have been traded upon an impersonal market has eluded uniform analysis by judicial writers. The courts and legal writers seem to agree that the plaintiff must establish a causal connection between the defendant's misconduct and his loss, *Bromberg, supra,* § 8.7.1 at 213–14, but what exactly plaintiff must show to establish this causal element is unclear.

### V.

We conclude that upon the facts of this case defendants' conduct caused no injury to plaintiffs and the judgment of the district court must be reversed. It is undisputed that defendants did not purchase any shares of stock from plaintiffs, and that defendants' acts of trading in no way affected plaintiffs' decision to sell.

■ We are unable to agree with the observation of the district judge in *Shapiro* that ". . . it is the act of trading without disclosing material inside information which causes plaintiffs' injury . . . Having breached that obligation [to abstain or disclose], the defendants are liable for plaintiffs' injuries." 353 F.Supp. 264, 278. The flaw in this logic, we conclude, is that it assumes the very injury which it then declares compensable. It does so by presupposing that the duty to disclose is absolute, and that the plaintiff is injured when the information is denied him. The duty to disclose, however, is not an absolute one, but an alternative one, that of either disclosing or abstaining from trading.[23] We conceive it to be the act of trading which essentially constitutes the violation of Rule 10b–5, for it is this which brings the illicit benefit to the insider, and it is this conduct which impairs the integrity of the market and which is the target of the rule. If the insider does not trade, he has an absolute right to keep material information secret. *SEC v. Texas Gulf Sulphur Co., supra,* at 848. Investors must be prepared to accept the risk of trading in an open market without complete or always accurate information. Defendants' trading did not alter plaintiffs' expectations when they sold their stock, and in no way influenced plaintiffs' trading decision. *See* Ratner, *Federal and State Roles in the Regulation of Insider Trading,* 31 Bus.Law 947, 966–67 (remarks of Robert Mundheim).

■ We hold, therefore, the defendants' act of trading with third persons was not causally connected with any claimed loss by plaintiffs who traded on the impersonal

---

**23.** In *Shapiro,* Judge Tenney attempted to analogize the alternative nature of an insider's duty under the abstain or disclose rule to the duty of a person helping a drowning man. Under tort law, there is no duty imposed upon an individual to save a drowning man. If, however, defendant gets in a boat and extends his hand to save the man and thereafter lets go, the law will hold him liable for the drowning man's death. Judge Tenney argued that when defendants decided to trade, this created a further duty to disclose, the breach of which caused plaintiff's injury.

We find the analogy unpersuasive. It is quite clear that in the above situation, the defendant's decision to let go of the drowning man's hand is the cause of his death. Here, defendants' intervening act, the act of trading with a third person, bears absolutely no causal relationship whatsoever to plaintiffs' injury. The faceless nature of the securities market makes plaintiffs' loss totally unrelated to defendants' breach of Rule 10b–5 which occurs when defendant trades.

market and who were otherwise unaffected by the wrongful acts of the insider.[24]

Likewise, we are not persuaded, as was the Second Circuit in its decision in *Shapiro, supra,* that *Affiliated Ute Citizens v. United States, supra,* mandates a "short, and . . . conclusive answer" to the contrary, 495 F.2d 228, 238.

In *Affiliated Ute,* certain members of the Ute Indian tribe brought suit against a bank and two of its employees under Rule 10b–5. The basis of the complaint was that the bank, which held certain shares of stock owned by plaintiffs, had arranged sales of the stock without disclosing to the plaintiffs certain material information, including the fact that defendants were making a market in the stock, purchasing some of it for their own account, and that the stock was sold for a substantially higher price to non-members of the tribe. The district judge entered judgment for plaintiffs. The Court of Appeals reversed, holding there could be no recovery under § 10(b) and Rule 10b–5 without proof that the plaintiffs had relied upon some misrepresentation by defendants. In reversing the Court of Appeals, the Supreme Court held:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970); SEC

*v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (CA2 1968), cert. denied *sub nom. Coates v. SEC,* 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969); 6 L. Loss, Securities Regulation 3876–880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud—SEC Rule 10b–5, §§ 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. *Chasins v. Smith, Barney & Co.,* 438 F.2d [1167] at 1172 (CA2).

406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741.

It is this language which the Second Circuit, in *Shapiro,* felt to be controlling upon it. We are unable to construe the language quoted so broadly. It was shown in *Affiliated Ute* that the defendant bank employees had engaged in prior business dealings with the plaintiff Indians.[25] They entered into a deliberate scheme to induce the plaintiffs to sell their stock without disclosure of material facts which would have influenced the decision to sell. The resulting sales were a direct result of the scheme. Thus it comes as no surprise that the Supreme Court concluded that "[U]nder the circumstances of this case," 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741, all that was necessary was that the information withheld be material in order to establish the requisite causation.

That the quoted language was not intended to produce such a far-reaching result we think is indicated by Justice Blackmun's reference therein to *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir.

---

24. The question of causation of injury when insiders trade in the open market has generated considerable comment. *See e. g.,* Bromberg, *supra,* §§ 7.4, 8.7, Painter, *Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5,* 65 Colum. L.Rev. 1361, 1372, 1377–78 (1965), Painter, *Federal Regulation of Insider Trading,* 125 (1968), Ratner, *Federal and State Roles in the Regulation of Insider Trading,* 31 Bus.Law 947, 955–56 (1976), Comment, *Damages to Uninformed Traders for Insider Trading on Impersonal Exchanges,* 74 Colum.L.Rev. 299, 314–15, 319 (1974), Note, *Limiting the Plaintiff Class: Rule 10b–5 and the Federal Securities Code,* 72 Mich.L.Rev. 1398, 1423–24, 1429 (1974), Com-

ment, *Insiders' Liability Under Rule 10b–5 for the Illegal Purchase of Actively Traded Securities,* 78 Yale L.J. 864, 870–872 (1969), Note, 80 Harv.L.Rev. 468, 475 (1966), Note, *Civil Liability Under Section 10(b) and Rule 10b–5: A Suggestion for Replacing the Doctrine of Privity,* 74 Yale L.J. 658, 675–76 (1965).

25. It seems clear that because of their prior business dealings with plaintiffs, defendants in *Affiliated Ute* owed a duty of disclosure to them. For an extensive discussion of the case, *see* Comment, *Affiliated Ute Citizens v. United States—The Supreme Court Speaks on Rule 10b–5,* 1973 Utah L.Rev. 119.

1970). *Chasins*, like *Affiliated Ute*, involved direct dealings between Chasins, an investor, and Smith, Barney & Co. as his broker-dealer. It was charged that Smith, Barney & Co., in handling Chasins' accounts, had violated Rule 10b–5 by failing to disclose when it strongly recommended certain stocks to Chasins that it was also a market maker in those same stocks. The question immediately before the court was whether, as part of his proofs, Chasins must show that in making his purchases he in fact relied upon the recommendation made. Under the facts of the case, the court concluded that positive proof of reliance was not required:

> To the extent that reliance is necessary for a finding of a 10b–5 violation in a non-disclosure case such as this, the test is properly one of tort "causation in fact." *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969). Chasins relied upon Smith, Barney's recommendations of purchase made without the disclosure of a material fact, purchased the securities recommended, and suffered a loss in their resale. Causation in fact or adequate reliance was sufficiently shown by Chasins.

438 F.2d 1167, 1172.

Here, unlike *Affiliated Ute*, defendants did not perpetrate any scheme to induce defendants to sell their stock. Plaintiffs and defendants here had no relationship whatever during the period in question. The plaintiffs in *Affiliated Ute* had a right to expect that the defendant bank officials would fully disclose all material informa-

tion concerning the stock while inducing them to sell. When defendants did not make full disclosure, they breached Rule 10b–5 and became liable for plaintiffs' foreseeable damages. The type of relationship existing between plaintiffs and defendants in *Affiliated Ute* is totally absent here.

## VI.

Neither do we believe that sound policy considerations support the result reached by the district court.[26] Logic, at first blush, tends to support extension of the civil remedy to persons trading in an impersonal market in the context presented here. Congress certainly never intended § 10(b) to be limited in its scope solely to face-to-face transactions. Indeed since the Securities Exchange Act of 1934 is aimed at nationwide practices, H.R.No.1383, 73rd Cong., 2nd Sess. 11 (1934), it would be idle to exclude from its operation those over-the-counter and national stock exchange transactions which are most characteristic of the national market. *See SEC v. Texas Gulf Sulphur, supra*, 401 F.2d 833, 848.

The key issue, as we see it, is not whether the proscriptions of § 10(b) and Rule 10b–5 should encompass open market transactions, which they should, but whether the civil remedy must invariably be coextensive in its reach with the reach of the SEC, which under the Act, was designated by the Congress as the primary vehicle of its enforcement. We reject such a view where its application leads us inexorably to an unjust and unworkable result.[27] By so extending the liability of defendants here

---

**26.** We think it appropriate that the court take into account policy considerations in deciding questions concerning the scope of civil actions under Rule 10b–5. As noted by Justice Rehnquist in *Blue Chip Stamps, supra:*

> . . . it would be disingenuous to suggest that Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect to Rule 10b–5. It is therefore proper that we consider . . . what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance.

421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539.

**27.** We specifically do not reach the question of availability of the remedy to open market situations where the insider trading with resultant price changes has in fact induced the plaintiffs to buy or sell to their injury. *See* Painter, *Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5*, 65 Colum.L.Rev. 1361, 1370 (1965). Here there was no proof that defendants' insider trading had any impact whatever upon the value of Old Line stock.

beyond that which has already been imposed through the SEC enforcement action, we believe we would be doing violence to the intent of the statute and rule, creating a windfall for those fortuitous enough to be aware of their nebulous legal rights, and imposing what essentially must be considered punitive damages almost unlimited in their potential scope.[28]

Where private civil actions under Rule 10b–5 have been employed in essentially face-to-face situations, the potential breadth of the action was usually contained. However, extension of the private remedy to impersonal market cases where plaintiffs have neither dealt with defendants nor been influenced in their trading decisions by any act of the defendants would present a situation wholly lacking in the natural limitations on damages present in cases dealing with face-to-face transactions. We think the potential liability of Bradford, Jr. in this case, noted earlier, is sufficiently illustrative of the dangers posed.[29]

We recognize that in precluding recovery here, it may be argued that the deterrent impact on insider trading of a large award of damages is thereby lost. A similar argument was found unpersuasive by the Supreme Court in *Bangor Punta Operations v. Bangor & A. R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). In that case, Bangor Punta Corporation sold all of its stock (98%) in a subsidiary company to Aroostook Corporation, which then assumed responsibility for the subsidiary's management and acquired additional shares to give it 99% ownership of the subsidiary. Suit was then brought by the subsidiary against Bangor Punta, alleging various acts of mismanagement during a seven year period prior to Bangor Punta's sale of the subsidiary. The Supreme Court upheld the district court dismissal of the action holding that Aroostook Corporation, the beneficiary of any recovery, was not injured by any mismanagement of the subsidiary which may have occurred.

Noting an assertion by the Court of Appeals that allowing recovery would assure that the Bangor Punta would not be immune from liability for its wrongful conduct and would serve a public purpose by providing a needed deterrent to corporate mismanagement, Justice Powell observed:

> Our difficulty with this argument is that it proves too much. If deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice. No injury or violation of a legal duty to the particular plaintiff would have to be alleged. The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning. Suffice it to say that we have been referred to no authority which would support so novel a result, and we decline to adopt it.

417 U.S. 703, 717, 94 S.Ct. 2578, 2586, 41 L.Ed.2d 418.

While we hold to the view that the private action should be compensatory, it is to be observed that in any event the 1934 Act provides a number of non-compensatory sanctions to deter insider misconduct, in-

28. We express concern similar to that noted by Judge Friendly in his concurring opinion in *SEC v. Texas Gulf Sulphur, supra,* that broad extension of the civil remedy under Rule 10b–5 in open market cases "will lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers . . ." 401 F.2d 833, 867. *See also Blue Chip Stamps, supra,* 421 U.S. 723, 739, 95 S.Ct. 1917, 44 L.Ed.2d 539.

29. Plaintiffs sold Old Line stock in the over-the-counter market in various lots on June 13, 14 and 15, 1972. Based upon the market data received in evidence at the trial, if all of the persons who had sold their shares of Old Line stock on those days alone had joined in the instant lawsuit, Bradford Jr.'s potential liability in damages would have totalled approximately $800,000. If a class action had been brought which included all investors who sold Old Line stock between April 21 and June 29, 1972, the damages could have totalled approximately $3,700,000. If the class had been further expanded to those selling up to November 20, 1972 (and the holding appealed from admits of no limitation short thereof), the damages would have run in excess of $7,000,000.00. As noted earlier, Bradford, Jr.'s profit from his illegal purchases, already disgorged in an SEC proceeding, amounted to about $13,000.

cluding SEC investigations and criminal sanctions.[30] Further, the SEC may ask the federal district court, in the exercise of its equity jurisdiction under § 27 of the 1934 Act, to require an insider to disgorge any profits he may have made from his illegal trading, *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), or even an amount in excess of the amount of illicit profits which the insider has made. *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974).[31] Finally, state law may provide various sanctions against insider trading.[32]

Whether the sanctions imposed upon the defendants here together with others which were also available amount to a sufficient vindication of the public rights and to an adequate deterrent to future misconduct we need not say. We may at least observe that the impact is bound to be significant.

Finally, it has been suggested that the problem of unlimited damages can be avoided by allowing recovery to all plaintiffs who traded during the period of non-disclosure, but limiting recovery to the amount of defendants' profits from insider trading. This type of limitation has been incorporated into the proposed ALI Federal Securities Code (Tent.Draft No. 2, March 1973). In situations where the insider trades in an impersonal market on inside information, § 1402(f)(2)(B) of the proposed Code limits the damages for which he becomes liable "to the extent of the securities that the defendant sold or bought". Thus were the proposed Code in effect in this case, defendants' liability would presumably be limited to the amount by which the price of Old Line stock increased between the time they purchased and the time of public disclosure of the inside information multiplied by the number of shares defendant purchased. *See* Note, *Limiting the Plaintiff Class: Rule 10b–5 and the Federal Securities Code*, 72 Mich.L.Rev. 1398, 1428 (1974).

As compared to Congress or administrative agencies such as the SEC, we think the courts are ill-fitted to the task of rulemaking which would be required. As we see no connection between defendants' violation of Rule 10b–5 and plaintiffs' alleged losses, we decline to base our decision upon a rule of limitation of damages here.[33]

---

**30.** The SEC, as the agency designated by Congress to enforce the securities laws, has express power to conduct investigations of past or potential violations of those laws. 15 U.S.C. § 78u(a)–(c). It may turn over information gathered through investigations to the attorney general for use in criminal prosecutions. 15 U.S.C. § 78u(e). The 1934 Act provides for fines and imprisonment of up to five years for willful violations of the Act. 15 U.S.C. § 78ff (as amended June 4, 1975).

**31.** Such relief has been held available where the SEC seeks the disgorging of profits as "ancillary" relief to an injunction against future violations of the Act. 15 U.S.C. § 78u(e). There may be situations, however, where the SEC will prefer to bring an administrative proceeding rather than go into court seeking injunctive relief. One such case was *Investors Management Co., Inc.*, SEC Sec.Ex.Rel. No. 9267 (July 29, 1971), an administrative action involving the same facts out of which the litigation in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith* arose. In such situations, however, the SEC itself has no power to require the respondents in its proceeding to disgorge profits. *See* Ratner, *Federal and State Roles in the Regulation of Insider Trading*, 31 Bus.Law, 947, 954 (1976).

**32.** Most state courts appear not to recognize any cause of action by an individual where an insider has traded in the open market on inside information. *Goodwin v. Agassiz*, 283 Mass. 358, 186 N.E. 659 (1933). However, some states have recognized that the insider may be held liable to the corporation for the profit made on his improper trading. *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949). One court has indicated that sanctioning such suits is necessary as a deterrent against insider trading by corporate officers. *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y. S.2d 78, 248 N.E.2d 910 (1969).

**33.** It seems clear that if recovery is to be allowed against insiders in an open market context, some limitations upon damages must be imposed. Imposition of unlimited liability could not only lead to individual injustice, but would have the effect of leading corporate officers, directors and other insiders to refrain from trading in the corporation with which they are associated. We cannot believe that this unhealthy result was intended by Congress in enacting the 1934 Act.

The district judge alternatively found that defendants Bradford, Bradford, Jr. and Bradford and Co. had violated Rule 10b–6 by trading in Old Line stock as broker-dealers during the period that negotiations of the merger were occurring. As noted earlier, none of these defendants ever traded with plaintiffs, nor is there any proof their trading activities caused any change in the price of Old Line stock or in any way influenced plaintiffs' decision to sell. Accordingly, our conclusion that defendants' conduct in no way caused any loss to plaintiffs is equally applicable to a theory of liability under Rule 10b–6.

Reversed and remanded for entry of judgment for defendants.

CELEBREZZE, Circuit Judge (concurring):

I concur in the result reached by the Court. However, because of the importance of defining the scope of civil liability under rule 10b–5 in an open market context and the apparent divergence of today's decision and that of the Second Circuit in *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974); aff'g, 353 F.Supp. 264 (S.D.N.Y.1972), I feel compelled to explain my reasons for joining in the Court's decision.

There is no doubt that Appellants, J. C. Bradford and J. C. Bradford, Jr., actively engaged in trading for their own account on the basis of material inside information which had not been disclosed to the trading public. This was a patent violation of the "disclose or abstain" rule announced in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2nd Cir. 1968). In *Shapiro* the Second Circuit extended the rule to provide a basis for recovery in private actions for damages. 495 F.2d at 236. I do not read today's decision as a repudiation of the "disclose or abstain" rule in private damage actions. Rather, I see the Court's opinion as imposing a rational limitation on the scope of civil liability under rule 10b–5 for insiders trading in the open market.

There is an obvious need to restrict the scope of civil liability of insiders trading in the open market. If an insider trades in a widely-held stock which is actively traded on a national market, the number of potential plaintiffs could be astronomical and the possible award of damages may be grossly disproportionate to the volume of the insider trading. The Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 745–47, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), recently addressed the problem of limiting the class of potential plaintiffs in 10b–5 civil actions. The majority, in affirming the purchaser-seller requirement of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1951), expressed alarm at the potentially vast number of persons who could conceivably bring civil suits under rule 10b–5 absent meaningful restrictions on the scope of the judicially-created cause of action. The Supreme Court exhorted federal courts to consider the practical implications of extending civil remedies to those who bear only a tangential relationship to the transactions giving rise to violations of rule 10b–5. 421 U.S. at 749, 95 S.Ct. 1917.

The limitations this Court places on the scope of an insider's liability in damages to traders on the open market is consistent with the directive of *Blue Chip Stamps*. An insider who breaches the "disclose or abstain" rule by trading in the open market should not become a virtual insurer for losses sustained by those who happen to trade in the same stock weeks after the insider has ceased his trading activities.[1] There must be some causative link between breach of the insider's duty to disclose the withheld information before trading and the losses incurred by would-be plaintiffs.[2] On the other hand, an insider should not

---

1. [T]he aim of the rule [10b–5] in cases such as this is to qualify, as between insiders and outsiders, the doctrine of *caveat emptor* —not to establish a scheme of investors' insurance.

*List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir. 1965).

2. Causation, as an element of 10b–5, must be proved in some form or "else defendants could

escape civil liability for conduct which would clearly violate rule 10b–5 in a face-to-face transaction, by the simple expedient of restricting his trading to the open market where the mechanics of the marketplace make it difficult, if not impossible, to trace particular transactions.[3]

It was fear of creating a loophole in the "disclose or abstain" rule which led the Second Circuit in *Shapiro* to reject the argument that the rule should be restricted to SEC injunctive actions or to private suits where the actual purchasers of the stock could be identified. 495 F.2d at 236–37. To do so, the Court reasoned, would be to circumvent the strong policy considerations supporting the rule and "make a mockery" of an insider's duty to disclose or abstain from trading.[4] *Id.* Indeed, the "disclose or abstain" rule was devised to cope with the difficulty in tracing transactions in an impersonal market. Since the mechanics of the marketplace make it virtually impossible to identify the actual investors with whom an insider is trading, the duty of disclosure is owned to investors as a class who trade on the market during the period of insider trading.[5] As the Court stated in

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 848:

> [T]he Rule is based in policy on the justifiable expectations of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information. . . .

The essence of the "disclose or abstain" rule is the inherent unfairness in allowing an insider to enter the open market and trade for his own account in the securities of a corporation on the basis of material inside information " 'knowing [such information] is unavailable to those with whom he is dealing,' i. e., the investing public." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 848, quoting *Matter of Cady, Roberts & Co.*, 40 SEC 907, 912 (1961). "It is, in fact, the insider's advantage over others in trading the corporation's securities which gives rise to the duty of disclosure." Painter, 65 Colum.L.Rev. at 1384. The "disclose or abstain" rule accomplishes two salutory purposes of rule 10b–5: it insures the integrity of the marketplace and it compènsates for the inequity of trading with a corporate insider who has superior access to material inside information.[6] *See* 401 F.2d at 848.

---

be held liable to all the world." *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969).

3. The mechanics of trading in the over-the-counter market are detailed in the Court's opinion. Transactions are negotiated through broker-dealers who match buy and sell orders at random. Traders in the market have no way of identifying the ultimate sellers or purchasers of shares traded. No matter how an insider trade is accomplished, however, there are certain to be investors on the opposite side of the transaction who are deserving of rule 10b–5 protection. It would be anomalous if the impersonal nature of trading on the open market was to defeat civil liability for insiders trading in violation of rule 10b–5 since the trading markets were the original targets of Congress in 1934. *See* A. Bromberg, Securities Law: Fraud—SEC Rule 10b–5 § 817(1) at 217 (1971).

4. In this case the defendants purchased the bulk of their shares from the inventory of their own brokerage house, J. C. Bradford & Co. They were, in effect, trading with themselves. If recovery were limited to those who actually sold Old Line stock to defendants, their own company would be the principal plaintiff. This

would be an absurdity. An insider should not be immunized from liability simply because he trades through intermediaries. *See Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909). The real persons requiring protection are the anonymous investors whose Old Line shares were funneled to defendants through various broker-dealers.

5. Since in any active market disclosure to a particular individual is not feasible, the duty to disclose, if such a duty exists, must be owed to all members of that ill-defined class of stockholders who, with the benefit of inside information, would alter their intention to sell. Thus, it must be concluded that all those who sold while the defendant was purchasing should be accorded equal rights of recovery.

Painter, *Inside Information: Growing Pains for the Development of Federal Corporation Law*, 65 Colum.L.Rev. 1361, 1378 (1965).

6. One commentator has suggested that compensatory remedies are inappropriate where trading in the open market is concerned. Note, *Limiting the Plaintiff Class: Rule 10b–5 and the Federal Securities Code*, 72 Mich.L.Rev. 1398, 1492 (1974). He states that deterrence

Given the availability of the "disclose or abstain" rule to private litigants, the problem of identifying those entitled to recover for breach of that duty remains. At common law, recovery for deceit was limited to these who could show "reliance" and "privity". *See generally* W. Prosser, Law of Torts § 105 at 685–86, 700–02 (4th ed. 1971). Due to the impersonal nature of trading on the open market and the remedial purpose of rule 10b–5, "privity" and "reliance" as means for limiting the plaintiff class have generally fallen into disfavor. *See generally* Painter at 1370, 1372. Since there is no practical method for matching purchases and sales in the open market, requiring privity in the common law sense as an element of rule 10b–5 would create an insurmountable obstacle for plaintiffs.[7] Reliance also has little relevance to trading in the open market where there are no face-to-face negotiations as a rule, and where non-disclosure of a material fact is often the gravamen of the complaint. *See e. g., Blackie v. Barrack*, 524 F.2d 891, 905–06 (9th Cir. 1975). *See also* Note, *The Reliance Requirement In Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 589–600 (1975).

Without reliance, however, there is no causative link between defendants' conduct and plaintiffs' investment decisions. And without at least a "semblance of privity" defendants' liability could extend to complete strangers. *See Joseph v. Farnsworth Radio and Television Corp.*, 99 F.Supp. 701, 706 (S.D.N.Y.1951), *aff'd*, 198 F.2d 883 (2d Cir. 1952). *Cf. Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969). In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court dispensed with the requirement of showing actual reliance where liability was grounded on the non-disclosure of a material fact by individuals in a fiduciary relationship to the plaintiffs. Where there is such a relationship, the Court indicated that all that need be shown to prove causation is "causation-in-fact"—an affirmative obligation of disclosure and the withholding of material information. 406 U.S. at 153–54, 92 S.Ct. 1456. Because of the materiality of the information, the Court was willing to presume that disclosure would have affected plaintiffs' investment decisions.[8] *See gen-*

---

should be the goal of 10b–5 in the open market and that curbing an insider's "abuse of the market" is better left to SEC investigations and criminal sanctions. One problem with the author's suggestion is that SEC manpower is limited and the time necessary to investigate and prosecute cases which now are processed through the civil courts would, in many cases, be prohibitive. Another is the limitation on the scope of remedies available to the SEC. Although courts have ordered disgorgement of profits as "ancillary relief" in SEC injunctive actions, there is no such remedy if the Commission chooses to proceed through administrative actions against investment advisors or broker-dealers. *See Ratner, Federal and State Roles in the Regulation of Insider Trading*, 31 Bus.Law 947, 954–55 (Feb. 1976). Also, merely requiring an insider to disgorge the profits he made through his illegal trading may not satisfy either the deterrent or compensatory goals of rule 10b–5. Criminal sanctions are an inadequate substitute for civil proceedings because of the different standard of proof and other factors unrelated to securities regulation which make a conviction for criminal charges much more difficult to procure than a finding of civil liability. Civil liability serves both the deterrent and the compensatory functions of rule 10b–5. The prospect of a substantial money judgment is likely to cause an insider to pause and reflect before entering the market to trade on the basis of confidential information and, at the same time, bolster the confidence of investors that they need not accept the financial "risk" of trading with individuals who have superior access to inside information.

7. Plaintiffs should not be required to prove that it was their particular stock certificates which passed through various brokerage houses and came to rest in an insider's portfolio. As the Second Circuit said in *Shapiro*, 495 F.2d at 239: "It would make a mockery of the 'disclose or abstain' rule if we were to permit the fortuitous matching of buy and sell orders to determine whether a duty of disclosure were violated." *See also* Painter, 65 Colum.L.Rev. at 1372, 1377–78. One commentator has suggested that courts have dismissed cases for "lack of privity" when their real concern was over the absence of causation between the insider's trading and the plaintiff's losses. Bromberg § 8.7(1) at 215 n. 68.

8. The presumption of causation is rebuttable. *Chelsea Assoc. v. Rapanos*, 527 F.2d 1266, 1271–72 (6th Cir. 1975).

*erally* Note, *Reliance Under Rule 10b–5,* 24 Case W.Res.L.Rev. 363, 385–88 (1973). In Shapiro the Second Circuit found *Affiliated Ute* controlling on the causation issue. 495 F.2d at 238. The Court reasoned that the duty of disclosure imposed on an insider who chooses to sell or recommend selling a certain stock on the basis of material inside information establishes the requisite element of causation-in-fact for those who purchased that stock during the same period. 495 F.2d at 240–41.

In the present case, the Court holds that persons who trade on an open market weeks after an insider has concluded his trading activity must establish more than the materiality of the undisclosed information to demonstrate that their losses were caused by defendants' trading.[9] As the Court notes, the "disclose or abstain" rule is stated in the alternative. Trading is the gravamen of the offense.[10] The public has no absolute right to the undisclosed information. It is only when the insider enters the market and creates an informational imbalance that a duty to disclose is imposed to protect the anonymous investors trading with the insider. *See SEC v. Texas Gulf Sulphur Co., supra* at 848. The duty of disclosure is owed to the class of investors trading contemporaneously with the insider and it is only this group who are the proper beneficiaries of the relaxed causation standard of *Affiliated Ute.* These investors as a class are disadvantaged by the superior knowledge of the insider. The stocks they traded generate the insider's profits.[11]

There was admittedly no connection between Appellants' trading and Appellees' decision to sell their Old Line stock. Appellees are in precisely the same situation they would have been in if Appellants had chosen to abstain from trading. Since they entered the market weeks after Appellants had ceased trading, none of the shares they sold could possibly have been purchased by Appellants. When Appellees entered the market, the information available to investors had returned to equilibrium. Non-contemporaneous traders do not require the special protection of the "disclose or abstain" rule because they do not suffer the disadvantage of trading with someone who has superior access to information. Parties on both sides of the transaction have equal access to information. Of course, as a practical matter, if the insider had made full public disclosure before trading subsequent traders would have been aware of the information and able to gauge its effect on the market. In this sense, whatever losses they suffered were "caused" by the insider's fail-

9. Although the Court specifically does not address the question of market manipulation, if an insider's trading affects the market price to the extent of creating an artificial market in a security, subsequent investors who were induced to trade on the basis of the price change could logically establish transactional causation without reference to an insider's duty to "disclose or abstain." *See Cochran v. Channing,* 211 F.Supp. 239 (S.D.N.Y.1962). *See generally* 88 Harv.L.Rev. at 592–96.

10. Trading triggers the duty to "disclose or abstain" in a straight insider trading case—a case where insiders were trading solely on their own account. *Texas Gulf Sulphur* also involved tipping and the Court held that recommending a trade based on material undisclosed information also gives rise to a duty to disclose. 401 F.2d at 848. The distinction between pure insider trading and tipping has relevance to the breadth of the duty of disclosure owed investors in the market. *See* discussion *infra* at 327.

11. As noted above, the mechanics of the market necessitate designation of the class of contemporaneous investors as surrogate plaintiffs for those who actually traded with the insiders. This class must include investors who were in no way involved in the insider transactions, and except for the time of their trading, are indiscernible from subsequent traders. However, to accomplish the deterrent and compensatory purposes of 10b–5, it is better to be overinclusive in the definition of the plaintiff class than underinclusive.

Of course, limiting the plaintiff class to contemporaneous traders does not remove the spectre of "Draconian" damages. The number of persons trading contemporaneously with an insider in the open market could still be enormous. However one may limit liability, the prospect of a ruinous recovery remains until some realistic measure of damages is devised. But this question is better left to the remedy stage where a court can employ its equitable powers in shaping an award or until such time as the Congress chooses to act on this problem.

ure to disclose. But, as the Court points out, that presupposes that the insider's duty of disclosure runs to investors who have no possible connection to the insider trading. I also am unwilling to extend the "disclose or abstain" rule beyond the class of investors it was designed to protect—those trading contemporaneously with the insiders.

On remand from the Second Circuit, the District Court in *Shapiro* rejected the argument that recovery should be limited to those who purchased Douglas common stock during the period when defendants were actively trading in or recommending trading in the stock. *Shapiro v. Merrill Lynch, Pierce, ᵀenner & Smith, Inc.,* CCH Sec.L. Rep. ¶ 95,377 at 98,874, 98,877–78 (1976 Transfer Binder) (S.D.N.Y. Dec. 9, 1975). Instead, the District Court held that the duty of disclosure extends "to all purchasers trading contemporaneously with defendants' wrongdoing, that is, 'while such information remains undisclosed.' " *Id.* at 98,878. Under this view, Appellees would be able to recover their losses from Appellants even though there was no possible connection between their trading and that of the insiders. Recovery would simply be based on their sale of Old Line Stock sometime before effective public disclosure of the planned merger. While I agree with the District Court in *Shapiro* that "liability should be coterminous with the duty breached by the wrongdoer," *id.,* I feel that the District Court has misinterpreted the breadth of the "disclose or abstain" rule in a straight insider trading situation. To repeat, the wrong which gives rise to the duty to "disclose or abstain" is the act of trading without disclosure. Neither an insider's trading when he is not in possession of material inside information, nor the decision to abstain from trading when he does

possess such information, gives rise to a duty of disclosure. That duty arises only when necessary to equalize the information available to outside investors who are actively trading with an insider who is privy to undisclosed material facts. When the insider ceases trading, the informational imbalance ends and the market returns to its normal state. However, where there is tipping in conjunction with insider trading the circumstances are significantly altered. When an insider tips material information to selected traders he is perpetuating the informational imbalance in the market and breaching a separate duty to treat all persons in the market alike. By tipping, the insider has set off a chain of events which perhaps may only be remedied by full public disclosure.[12] *Shapiro* was not a case of straight insider trading but involved tipping on a mass scale. The complaint was essentially aimed at Merrill Lynch's policy of selective leakage of information about Douglas' financial straits to favored customers who in turn unloaded their shares in the market to unwary purchasers. Under these circumstances, the District Court in *Shapiro* may have correctly defined the class of potential plaintiffs to include those in the market up to the point of effective public disclosure.

In this case, by contrast, the Bradfords engaged in a straight scheme of insider trading.[13] While I have no doubt that they knowingly violated rule 10b–5, I believe that recovery should be limited to those who sold Old Line shares between April 21st and 27th, 1972, the period when the Bradfords were actively purchasing Old Line Stock in the over-the-counter market. Since Appellees did not sell their shares during that period, I join in the Court's reversal of the decision below.

**12.** Tipping because it involves a more widespread imbalance of information presents an even greater threat to the integrity of the marketplace than simple insider trading. Tipping, by its very nature, is a more open-ended violation than that of the insider who enters the market, trades on his own account and withdraws.

**13.** The record shows that the Bradfords purchased Old Line Stock for their own account and for accounts under their control. The District Court made no finding that they also engaged in tipping information about the merger to other investors.